**UNITED STATES of America,
Appellee,**

v.

**Ronald A. MAYERSOHN, Defendant-
Appellant.**

**No. 169, Docket 71–1676.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 4, 1971.

Decided Nov. 22, 1971.

522

Michael S. Fawer, New York City (Stuart G. Schwartz, New York City, of counsel), for appellant.

Vincent J. Favorito, Asst. U. S. Atty., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty. for the E.D.N.Y., Brooklyn, N. Y., and David G. Trager, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before MOORE, HAYS and FEINBERG, Circuit Judges.

MOORE, Circuit Judge:

Ronald A. Mayersohn appeals from an order of the United States District Court for the Eastern District of New York denying his motion for a new trial.[1] The basis of the motion is newly discovered evidence. Finding no error in the decision of the court below, we affirm.

Mayersohn was convicted, after a jury trial, of evading military service by means of a fraudulent claim of mem-

1. United States v. Mayersohn, 335 F.Supp. 1339 (E.D.N.Y.1971).

bership in a reserve unit and of being a party to the making of a false statement bearing upon his classification for military service in violation of section 462(a) of Title 50.[2] Mayersohn's conviction is one of many obtained by the government on the basis of evidence provided by Paul Miller, the individual who procured, for a fee, fraudulent notices for some sixty young men that informed their draft boards that the young men were duly enlisted in a reserve unit. Enlistment in a reserve unit exempts one from the draft.[3]

The sole issue at trial was whether Mayersohn had knowledge of the fraudulent manner by which Miller would obtain his enlistment in a reserve unit. Miller testified at the trial that he told Mayersohn that the enlistment would be obtained by the use of a forged notice of reserve enlistment (Form DD44). Mayersohn, on the other hand, testified that he believed that he was simply buying Miller's well-known influence to secure the reserve enlistment.

Subsequent to the affirmance of his conviction by this court, 413 F.2d 641, Mayersohn retained new counsel. After certiorari to the Supreme Court was denied, counsel moved for a new trial.[4] Two basic grounds for a new trial were alleged: (1) that the government failed to inform the defense of certain statements made by Miller to FBI agents, and (2) that defendant had not been effectively represented at trial.[5] The second claim was later withdrawn. After a hearing, the district court filed an exhaustive opinion denying appellant's motion that the subsequently discovered Miller statements and the testimony of Miller's wife that was elicited at the hearing warranted a new trial.

### The Newly Discovered Miller Statements

At the conclusion of Miller's testimony at trial, defense counsel moved pursuant to the Jencks Act for all statements of Miller in the possession of the government.[6] Two such statements were turned over to the defense, one dated February 15, 1966, the other dated February 20, 1966. Each is a portion of Miller's detailed statement explaining his enlistment activities and the individuals involved.

What the government did not turn over was the report of what transpired on the night that Miller was arrested, January 31, 1966. This report was dated February 4, 1966. It provides, in relevant part:

> Miller stated that he had brought about their [the boys listed in a book

2. United States v. Mayersohn, Criminal Docket No. 66-116 (E.D.N.Y. Oct. 18, 1968), aff'd, 413 F.2d 641 (2d Cir. 1969), cert. denied, 397 U.S. 906, 90 S.Ct. 903, 25 L.Ed.2d 87 (1970). Section 12(a) of the Military Selective Service Act of 1967, 50 U.S.C. App. § 462(a) (1970), provides in relevant part that "[a]ny member of the Selective Service System * * * who shall knowingly make, or be a party to the making, of any false statement or certificate regarding or bearing upon a classification or in support of any request for a particular classification, for service under the provisions of this title * * * shall * * * be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment * * *."

3. See Selective Service System, Classification Rules and Principles, Rules 10, 13, 32 C.F.R. §§ 1622.10, 1622.13 (1971).

4. "The court on motion of a defendant may grant a new trial to him if required in the interest of justice. * * * A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment * * *." Fed.R. Crim.P. 33.

5. The basis for this second ground was that trial counsel had improperly decided not to call as witnesses or obtain the selective service files of two registrants who, like Mayersohn, obtained reserve enlistments through Miller, and "did virtually nothing to enforce attendance at trial of a witness of vital importance, Paul Miller's wife, Deborah Miller." Affidavit of Michael S. Fawer, Read in Support of a Motion ¶ 24 (Mar. 26, 1970). See Mayersohn, 335 F.Supp. at 1342.

6. See 18 U.S.C. § 3500 (1970).

handed over to a special agent] reclassification and that of many others listed in his books, to a deferred status, by causing to be forwarded to their draft boards military reserve forms, which advised the boards that these individuals had been enlisted in the reserve. He explained that he himself did not handle or even see the forms that were used in this operation, but that someone else handled the job of sending the forms to the local boards. He stated that at this time he did not wish to go into detail about the operation and did not wish to identify other persons who worked with him on the operation. He wished first to discuss the matter with his attorney, after which he probably would tell the Agents the entire story, but he wanted to get the "go-ahead" first from his attorney.[7]

Another report that apparently was not turned over to defense counsel was one of a request by Miller that his wife not be interviewed. There was considerable confusion at the hearing as to whether such a report was ever made, or whether a specific request therefor by Miller was made.[8]

### Debra Miller's Testimony

Miller's wife,[9] Debra Miller, testified at the hearing that she was present in the apartment on about six or eight occasions during her husband's meetings with boys desiring reserve enlistments. These meetings took place in the living room while she was either in the kitchen or in the dining area off the living room. Though she did not participate in the conversations held between her husband and the boys, she did eavesdrop and therefore did pick up "bits and pieces." On the basis of these bits and pieces she testified that she had never heard her husband inform the boys that he would obtain their enlistments by the use of fraudulent Form DD44s.

### ▮ The Suppressed Evidence as Grounds for a New Trial [10]

▮ Appellant contends that the breach by the government of its duty to

---

7. For the entire portion of the arrest-night report that was turned over to the defendant, see Mayersohn, 335 F.Supp. at 1339 n. 3.

8. Because we assume the existence of such a report containing such a request, we need not detail and resolve this confusion. See Transcript of Hearing at 437–42, 457–61.

9. The Millers were divorced prior to the trial of Mayersohn.

10. Appellant raises two arguments that do not warrant textual treatment. First, he protests Judge Zavatt's ex parte investigation into the size of the estate left by Mayersohn's father. See Mayersohn, 335 F.Supp. at 1345 n. 1. This investigation was prompted by the Judge's curiosity as to the validity of Mayersohn's claim for a hardship deferment, which claim was included in the defendant's selective service file. The prosecution did not in any way question the validity of this claim. While we agree with the appellant that this investigation was uncalled for, we fail to see its relevance to the issues raised on this appeal. The jury, not the judge was the arbiter of Mayersohn's credibility, and the jury, without the benefit of the knowledge gained from Judge Zavatt's investigation, found against Mayersohn's credibility. See generally Gordon v. United States, 178 F.2d 896 (6th Cir. 1949), cert. denied, 339 U.S. 935, 70 S.Ct. 664, 94 L.Ed. 1353 (1950).

Second, appellant argues that the failure of the government to inform the grand jury that Debra Miller was present during some of the conversations her husband had with boys seeking reserve enlistments was a deception violative of the integrity of the judicial process. The contention is without merit. With respect to hearsay evidence before grand juries, the rule is well established that an indictment will not be dismissed unless the grand jury is misled into thinking that the testimony of a hearsay declarant is the testimony of a witness before it, or unless the defendant can show that there is a high probability that with eyewitness rather than with hearsay testimony the grand jury would not have indicted. United States v. Leibowitz, 420 F.2d 39, 42 (2d Cir. 1969) (another Miller case). See Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); Costello v. United States, 350 U.S. 359,

disclose all of Miller's statements violated his right to due process.[11] Specifically, he argues that Miller's failure upon his arrest to state that the boys knew of the fraudulent nature of his activities, and his request to the government that his wife not be interviewed, would have been invaluable to the defense in its efforts to impeach Miller on the all important issue of Mayersohn's criminal knowledge.

■ We disagree. At the outset, we assume *arguendo* that the government possesses a report of Miller's request that his wife not be interviewed. We agree that both reports—of this request and of the statements made by Miller on the night of his arrest—should have been turned over by the government to the court pursuant to the Jencks Act

upon the conclusion of Miller's testimony.[12] However, this breach was inadvertent, not wilful. While the Assistant United States Attorney who tried this case had read the arrest-night report, it was part of a voluminous file on the "Miller" cases, it contained no specific reference to Mayersohn, and he simply forgot about it when he handed to the court the other Jencks Act material.[13]

■ In determining whether government suppression of evidence warrants a new trial, courts must resolve a conflict between two solidly established principles: (1) that sentences should be promptly enforced [14] and (2) that the government as prosecutor should be dedicated more to the pursuit of truth than to the pursuit of convictions.[15] The

363, 76 S.Ct. 406, 100 L.Ed. 397 (1956) ; United States v. Catalano, 439 F.2d 1100, 1102 (2d Cir. 1971), cert. denied, 404 U.S. ——, 92 S.Ct. 56, 30 L.Ed.2d 53 (1971) ; United States v. Payton, 363 F.2d 996 (2d Cir.), cert. denied, 385 U.S. 993, 87 S.Ct. 606, 17 L.Ed.2d 453 (1966). Appellant's claim meets neither test of *Leibowitz*; to accept his contention would be to invite the very time-consuming tests of the sufficiency of evidence before grand juries that *Costello* precludes.

11. While appellant apparently alleges a violation of the due process clause of the Fifth Amendment, the law that has evolved from the federal court suppression cases appears to be rooted in the supervisory power of the federal appellate courts over criminal trials. *See* United States v. Consolidated Laundries Corp., 291 F.2d 563, 571 (2d Cir. 1961). The cases involving review of the suppression of evidence by state officials rely, of course, on the Fourteenth Amendment's due process clause. *See, e. g.*, Miller v. Pate, 386 U.S. 1, 7, 87 S.Ct. 785, 17 L. Ed.2d 690 (1966). The extent to which the duty of federal officers with respect to the suppression of evidence is broader under the federal supervisory power than the obligation of state officers under the Constitution does not appear to have been squarely addressed. *Cf.* Communist Party of United States v. Subversive Activities Control Bd., 351 U.S. 115, 124, 76 S.Ct. 663, 100 L.Ed. 1003 (1956). *See generally* Hill, The Bill of Rights and

the Supervisory Power, 69 Colum.L.Rev. 181 (1969).

12. *See* Palermo v. United States, 360 U.S. 343, 351–355, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959) ; United States v. Annunziato, 293 F.2d 373, 381 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L. Ed.2d 134 (1961) ; United States v. Consolidated Laundries Corp., 291 F.2d 563, 570 (2d Cir. 1961).

13. For a fuller discussion *see Mayersohn*, 335 F.Supp. at 1361.

14. United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 90 L.Ed. 562 (1946). *See* United States v. Polisi, 416 F.2d 573, 577 (2d Cir. 1969) ; United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968) ; Burger, The State of the Judiciary—1970, 56 A.B.A.J. 929, 932 (1970) ; Christian, Delay in Criminal Appeals: A Functional Analysis of One Court's Work, 23 Stan.L.Rev. 676, 676 (1971) ; H. Packer, The Limits of the Criminal Sanction 39–48, 228–33 (1968) ; Statement of the Circuit Council to Accompany Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (1971).

15. Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). *See* Giles v. Maryland, 386 U.S. 66, 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (concurring opinion of Justice Fortas). *Cf.* Communist Party of United States v. Subversive Activities Control Bd., 351 U.S. 115, 124, 76 S.Ct. 663, 100 L.Ed. 1003 (1956) ; Olmstead v. United States,

former principle leads to the conclusion that motions for new trials are not favored;[16] the latter to the conclusion that the suppression of evidence is a violation of due process.[17]

In balancing these two principles, courts have reached the obvious conclusion: the more egregious the suppression, the less material to the verdict need be the evidence suppressed to justify a new trial.[18] Where the suppression is deliberate, the interest in enforcing the second principle becomes paramount.[19] Where the suppression is inadvertent, the principles reach equipoise and a careful analysis of the extent to which the evidence suppressed harmed the defendant is required.[20] As this court has said, the test then becomes whether "there was a significant chance that this added item [the item suppressed], developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction."[21]

We disagree with the appellant that there is a significant chance that the arrest-night report and the no-inter-

---

277 U.S. 438, 485, 48 S.Ct. 564, 72 L. Ed. 944 (1928) (dissenting opinion of Justice Brandeis). *See also* ABA, Canons of Professional Ethics, Canon 5 (1967).

16. United States v. Johnson, 327 U.S. 106, 112–113, 66 S.Ct. 464, 90 L.Ed. 562 (1946); Mittlieder v. Chicago & Northwestern Ry. Co., 441 F.2d 52, 56 (8th Cir. 1971); United States v. Costello, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). *See* Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); United States v. Nolte, 440 F.2d 1124, 1128 (5th Cir. 1971), cert. denied, 404 U.S. 862, 92 S.Ct. 49, 30 L.Ed.2d 106 (1971).

17. Pyle v. Kansas, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942); United States v. Keogh, 391 F.2d 138, 146–147 (2d Cir. 1968). *See* Wilde v. Wyoming, 362 U.S. 607, 80 S.Ct. 900, 4 L.Ed.2d 985 (1960) (*per curiam*).

18. Kyle v. United States, 297 F.2d 507, 514 (2d Cir. 1961) (involving an application to vacate sentence under section 2255 of Title 28).

19. United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968); Barbee v. Warden, 331 F.2d 842, 847 (4th Cir. 1964); Kyle v. United States, 297 F.2d 507, 514 (2d Cir. 1961); Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136, 138–139 (1964). *See, e. g., Miller* v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1966); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

20. *See* United States v. Bonanno, 430 F. 2d 1060, 1063 (2d Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970); United States v. Polisi, 416 F. 2d 573, 577 (2d Cir. 1969); United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969); United States v. Keogh, 391 F. 2d 138, 147–148 (2d Cir. 1968); Jackson v. Wainwright, 390 F.2d 288, 295–299 (5th Cir. 1968); Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287, 290–291 (1966); Barbee v. Warden, 331 F.2d 842, 847 (4th Cir. 1964); Kyle v. United States, 297 F.2d 507, 514 (2d Cir. 1961). *See also* United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964); United States ex rel. Almeida v. Baldi, 195 F.2d 815 (3d Cir. 1952), cert. denied, 345 U.S. 904, 73 S. Ct. 639, 97 L.Ed. 1341 (1953).

While most of these cases arise in the context of collateral attacks upon verdicts, their analyses apply with equal force to the standards applicable to motions for new trials. *See generally* 8A J. Moore, Federal Practice ¶ 33.02[3] (2d ed. 1970).

It is not perfectly clear as to how one is to measure the harm done to a defendant by the suppression. Some courts emphasize the effect the evidence would have had on defendant's pre-trial preparation, while others emphasize the effect the evidence would have had on the jury. *Compare Bonanno, supra*, 430 F. 2d at 1063 and Ashley v. Texas, 319 F.2d 80, 85 (5th Cir.), cert. denied, 375 U.S. 931, 84 S.Ct. 331, 11 L.Ed.2d 263 (1963) *with Miller, supra*, 411 F.2d at 830–831 *and Levin, supra*, 363 F.2d at 291. The former perspective would appear to be the more liberal test. However, it would seem that the ultimate question must be what the effect the suppressed evidence and the fruits thereof would have had on the trier of fact.

21. United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969).

view request could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction. Upon his arrest Miller specifically stated that he did not wish to go into details about his business; therefore, his failure to mention the specific knowledge of his clients concerning the fraudulent nature of his activities adds little force to the theory vigorously argued by trial counsel before the jury that Miller was selling out his clients in order to obtain a reduced sentence on his own conviction.[22] Equally lacking the requisite significance is Miller's request that his wife not be interviewed. Appellant contends that he could have argued to the jury that "Miller did not want his wife interviewed because he knew that she could only be destructive to the Government's case."[23]

However, there is another explanation for the request, namely, that Miller did not wish to involve his family in the government's investigation.[24] We do not believe that this request, as explained by these two alternative theories, would have induced a reasonable doubt in the minds of the jurors to avoid a conviction. Finally, the no-interview request and the arrest-night report would not have at all impugned the circumstantial evidence that strongly pointed to Mayersohn's state of mind: the $2,500 fee paid to Miller, Mayersohn's failure to contact the reserve unit in which he had obtained an enlistment, and his lack of surprise in the unit's failure to communicate with him subsequent to the enlistment.[25]

22. "So why does Miller, why should he lie against this innocent individual; [Mayersohn]?

* * * * *

"Well, we have one admission out of him, he is hoping for leniency. When you have committed as many crimes as he pleaded guilty to . . . you want a break.

* * * * *

"He [Miller] spent the night looking forward to his spending years in one [a jail], pacing back and forth in this little cage. For years, this is where I am going to be, for years this is where I have to live, never to touch a woman's hand, never to talk or walk in the park, never to smell the sweetness of spring, never to see the stars out at night, never to see the sun, never to have a beach to relax on and lie on, never to have the freedom of doing what I want to do, when I want to do it. . . . He got a taste of it and he didn't want any more and I don't blame him. That was the night of his arrest, January 31st, so he said; he went back and talked it over with his lawyer for a couple of weeks, and that memory prevailed, that smell and he decided to colloborate [sic].

* * * * *

"He was to buy his way out. He was going to buy his way out of that jail cell. He was going to do anything necessary to gain leniency." Summation of Defense Counsel, Transcript of Trial at 1099–1100, 1105, 1107.

23. Brief for Appellant at 38.

24. "As I say in the affidavit, Mr. Miller was exceedingly upset. His domestic life was at a boiling point. The day after he was arrested, he told me he got a telephone call from his wife's mother.

"Paul told me—I am calling him Paul—Paul told me that he was the white haired boy in the eyes of his mother-in-law until the night he was arrested.

"The following morning he got a telephone call in which she told him that he was a no-good bum, just as she had told her daughter, and she told her daughter she never should have married him.

"This was the beginning of sorrows, as far as Paul Miller's domestic life was concerned. This was a matter of every discussion with me.

"When I mentioned that we would like to talk to his wife—by no means. This could mean that we were actually endangering, in a very serious way, further endangering his marital life.

"And he discussed the matter with his attorney. And the idea was that Paul Miller was delivered to us to cooperate completely, and we were not to do anything to disturb Miller's home life." Testimony of FBI Agent John McKenna, Transcript of Hearing at 462.

25. Mayersohn testified that he never was sworn into his "assigned" reserve unit, never went to a meeting, never received any communication from this unit, was never issued a uniform, and did not become the least bit suspicious at not having received any communication from the unit. Transcript of Trial at 959–63. While this testimony supports the infer-

### Debra Miller's Newly Discovered Testimony [26]

 We fully agree with the district court that the testimony of Debra Miller at the hearing does not meet the rigorous tests for a new trial applicable to newly discovered evidence: her testimony only impeaches that of her husband, and would not probably produce a different verdict were there a retrial.[27] Her testimony does not refute her husband's on the issue of Mayersohn's criminal knowledge; it simply does not confirm it. The evidence makes clear that Debra was purposely not made privy to the conversations between Miller and his clients, that she eavesdropped on only a few of these conversations (she did not remember whether Mayersohn's was one of these), and that of these she heard only bits and pieces.[28] Clearly her testimony would not "probably" produce a different verdict were there a retrial.

Finding the grounds urged neither singly nor in combination sufficient to justify a new trial, we affirm the order of the court below.

---

ence that, *subsequent* to the meeting with Miller, Mayersohn possessed the requisite criminal knowledge, "the subsequent existence of a fact supports the inference of its earlier existence, when the subsequent condition is one which ordinarily would not exist unless it had also existed at the earlier time." United States v. Consolidated Laundries Corp., 291 F.2d 563, 569 (2d Cir. 1961).

26. At points in his brief appellant appears to argue that the testimony of Debra Miller should fall into the suppressed evidence category and thus be subject to the new trial standard applicable to such evidence, a much less rigorous one than that generally applicable to newly discovered evidence. *See* note 27, *infra*. For example, at trial the prosecutor mistakenly informed the court that the FBI could not find Debra Miller, and thus implied that the FBI had looked for her, when in fact it had not. However, this misstatement has no causal relation to the failure of Debra Miller to testify, and thus cannot be said to have led to the suppression of her testimony. First, at the time of trial Debra Miller was in Fort Worth, Texas. Transcript of Hearing at 100. More importantly, the statement in no way deterred defense counsel from seeking the presence of Debra Miller at trial; indeed, defense counsel fully expected her to appear, but as it turned out his investigator had served the wrong woman. *See Mayersohn*, 335 F.Supp. at 1356.

27. As this court said in *Polisi*, the essentials for a new trial based on newly discovered evidence are the following: (1) the evidence must have been discovered since the trial; (2) it must be material to the factual issues at the trial, and not merely cumulative or impeaching the character or credit of a witness; (3) it must be of such a nature that it would probably produce a different verdict in the event of a retrial. United States v. Polisi, 416 F.2d 573, 576–577 (2d Cir. 1969). *Accord,* United States v. Craft, 421 F.2d 693, 695 (9th Cir. 1970); Hudson v. United States, 387 F.2d 331, 333 (5th Cir. 1967), cert. denied, 393 U.S. 876, 89 S.Ct. 172, 21 L.Ed.2d 147 (1968); Edwards v. United States, 361 F.2d 732, 734 (8th Cir. 1966); Corey v. United States, 346 F.2d 65, 67 (1st Cir.), cert. denied, 382 U.S. 911, 86 S.Ct. 253, 15 L.Ed.2d 162 (1965).

Judge Zavatt ruled that in addition to failing to meet tests two and three of *Polisi*, the testimony of Debra Miller "most likely" did not meet the due diligence requirement implicit in test one. *See Mayersohn*, 335 F.Supp. at 1368. Because we find that the testimony does not meet tests two and three, we need not and do not pass on the soundness of this alternative ruling.

28. *See Mayersohn*, 335 F.Supp. at 1351.