UNITED STATES of America,

v.

Andrew MUNCHAK, Jr., Defendant.

No. 69 Cr. 90.

United States District Court,
S. D. New York.

Feb. 28, 1972.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., New York City, for the United States; Daniel J. Sullivan, Asst. U. S. Atty., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant; Edward N. Costikyan, Jack C. Auspitz, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This second motion for a new trial, based upon alleged perjury by a government witness and alleged newly discovered evidence, is made after the Court of Appeals affirmed the defendant's judgment of conviction,[1] as well as the denial of the prior motion for a new trial, based also upon alleged perjury of other witnesses, employees of the defendant.

Defendant was found guilty on December 30, 1969, after a seven-day jury trial on one count of a four-count indictment charging mail fraud violations.[2] Two counts, which concerned transistors labelled "JAN CGO 2N 1722," were dismissed by the court at the close of the government's case. The remaining two counts related to transistors labelled

1. United States v. Munchak, 443 F.2d 531 (2d Cir. 1971).

2. 18 U.S.C. § 1341.

"2N 1225 RCA"; the jury acquitted on one count and found the defendant guilty on the other. The indictment charged that the defendant made false representations that the labelled 2N 1225 RCA transistors (1) "were manufactured by firms which did not manufacture them"; (2) "were newer than they in fact were"; (3) "were in containers received from the manufacturer when this was not in fact the case"; and (4) "were of higher quality than was in fact the case."

With respect to defendant's present motion, neither party requested an evidentiary hearing, and after argument it was submitted for decision on the moving and opposing affidavits.[3] The court, in its consideration of the motion, in addition to its recollection of events at the trial, of witnesses and their demeanor, has read the entire trial transcript.[4]

In order to put the defendant's motion in proper focus, it is desirable at the outset to outline the substance of testimony. The evidence abundantly established that soon after defendant had received an order for a shipment of 2N 1225 transistors, he ordered five peg stamps bearing the insignia "RCA" circled by "2N 1225" and letter designations "D" and "H7",[5] and that the casings of transistors shipped by defendant's firm were marked with the symbols from the peg stamps. The defendant's version of his purpose in ordering the stamps and the use to which they were put was a central issue at trial.

On his present motion, the defendant asserts that newly discovered evidence from RCA's files shows that Albert Kick, chief security officer for RCA Electronic Components, did not tell the truth when he testified at trial that RCA had not performed any tests on the transistors in evidence; the defendant contends that these tests show the transistors were manufactured by RCA and were of good quality.[6] The charge must be considered against the totality of the evidence.

The defendant Andrew Munchak, Jr. is the president and owner of Astronetics, Inc., a dealer in the buying and selling of surplus transistors and other electronic parts. In August 1967, F. G. Mason Engineering Company, a manufacturer of radio surveillance equipment, placed an order for 5000 "RCA 2N 1225" transistors. After passing through intermediate distributors, Astronetics, Inc. received an order on August 31 for "2N 1225" transistors. Two days thereafter, the defendant ordered from Patterson Stamp Company five "peg stamps" bearing the mark "RCA", circled by the designation "2N 1225",

---

3. *See* United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946); United States v. Troche, 213 F.2d 401, 403 (2d Cir. 1954); United States v. On Lee, 201 F.2d 722 (2d Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953).

4. *See* United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 90 L.Ed. 562 (1946); Brown v. United States, 333 F.2d 723 (2d Cir. 1964) (per curiam); United States v. Garrison, 296 F.2d 461, 465 (7th Cir. 1961), cert. denied, 369 U.S. 804, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962); Wolcher v. United States, 233 F.2d 748, 751 (9th Cir.), cert. denied 352 U.S. 839, 77 S.Ct. 61, 1 L.Ed.2d 56 (1956); United States v. On Lee, 201 F.2d 722, 723 (2d Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953); United States v. Keogh, 271 F.

Supp. 1002, 1006 (S.D.N.Y.1967), aff'd in part, 391 F.2d 138 (2d Cir. 1968).

5. 2N 1225 is known in the industry as a "Jedec" symbol, usually stamped on the transistor casing. There are about 200 casing shapes. 2N is a genus of transistors; 1225 is the specification for a certain type; the letters D and H7 represent the manufacturing and shipping dates. RCA is one of two companies that manufacture 1225 transistors.

6. The defendant also moves for a judgment of acquittal, but that this court has the power to grant such a motion after entry of the judgment of conviction is open to serious doubt; in any event, there is substantial evidence to support the jury's verdict. *See* United States v. Weinstein, 452 F.2d 704 (2d Cir. 1971).

"H7" and "D". A peg stamp is a rubber dye at the end of a pencil-like shaft used for marking purposes. Several days after receiving the peg stamps, Astronetics shipped, in partial fulfillment of the order, approximately 2100 transistors which, after passing through intermediate distributors, finally were delivered to Mason Engineering. The casings of the 2100 transistors bore an RCA symbol similar to that appearing on the stamps Munchak had ordered. Collins, president of Patterson Stamp Company, testified that in his opinion the impressions on the tops of those transistors, nine of which were received in evidence at the trial, had been made by the peg stamps purchased by Munchak. A production supervisor of the Mason company testified that the transistors received by it failed to perform in the manner of prior "RCA 1225's"; they would regenerate or oscillate; they drew too much current and had a very short life span.[7] The deficiencies resulted in Mason company officials complaining to RCA, and the delivery by them to RCA in December 1967 of about fifteen of the transistors, with the bulk of the shipment returned to the intermediate company from which it had been purchased. Eventually these were returned to Astronetics.

A postal inspector testified to Munchak's statements that the transistors sold to Mason were part of a salvage lot Astronetics had purchased about three years previously; that when received they were placed on shelves in old and dirty boxes with old dates on them; that to make them more saleable they were repackaged in new small boxes imprinted with peg stamps purchased for that purpose; that the stamping was done by Willard McElwain and Gloria and Anne Smith, employees of Astronet-

ics. However, each employee denied having stamped any boxes with the peg stamp. Mason and each intermediary distributor through whom the shipment passed testified that the transistors were not in individual boxes, but were bulk packaged in large plastic boxes and in a plastic bag.

We now consider the testimony of Albert Kick upon which the defendant bases his claim for a new trial on the ground of alleged perjury and newly discovered evidence. Kick had been with RCA for twenty-seven years. In December 1967, he initiated an investigation following receipt by RCA of the fifteen transistors[8] from Mason upon its complaint as to the performance of the transistors contained in the Astronetics shipment. Kick's direct testimony concerned two major subjects—the stamping on the RCA transistors in evidence and conversations with Munchak during the course of the investigation. He also discussed when the transistors in question would have been produced were they of RCA manufacture. Kick testified that the markings on the transistors were not made by RCA; that in his opinion the peg stamps purchased by Munchak were used to stamp those transistors in evidence which had been sold to Mason. As already noted, Collins of the Patterson Stamp Company had previously testified to the same effect. Kick explained, on the basis of RCA's internal code system, why the casings of the transistors delivered to Mason could not have been stamped by RCA—the markings "D", "7" and "H" were not the style or type used by RCA; the letter showing the plant of manufacture was missing; the letter for the manufacturing date was in the wrong position; the number for the shipment date was upside down. According to RCA's code

---

7. Further examination into the quality of the transistors was cut off by defense counsel's objection on the ground of lack of relevance (292A). (References designated "A" refer to the Joint Appendix on Appeal.)

8. Nine of these transistors were received in evidence at the trial 2 years later (Government Exhibits 3A to 3i). While other transistors were in evidence, the critical testimony related to the 9 transistors which were part of the 15 RCA received from Mason.

system, the number on the nine transistors in evidence indicated a shipment date of August 1967 and recent manufacture. Kick testified that while he could not state with certainty whether or not RCA had manufactured the casings on which the stamp appeared, if RCA had manufactured them, it was no later than 1964, because in that year the company had changed the construction of the casing and the transistors sent to Mason were of the old type.[9]

Kick then testified to matters which the government urged as false exculpatory statements by Munchak. He called upon Munchak in January 1968 and told him he was tracing counterfeit transistors and had information that they had originated with Astronetics; when he handed Munchak samples of those shipped to Mason, the defendant, upon looking at them, stated, "anyone can see these are counterfeit or over-stamped, that they didn't come from here."

Under cross-examination, Kick adhered to the substance of his direct testimony that the transistors had been counterfeited with the RCA symbol and that Munchak had denied his firm had shipped them. Kick again acknowledged that the transistors in evidence could be genuine RCA parts, but asserted that

they would have been manufactured prior to 1964.[10]

We now come to that portion of Kick's testimony which the defendant alleges is perjurious. At the very conclusion of his cross-examination, he testified:

"Q You have told his Honor and the jury about your activities in connection with this investigation and the preparation of various photographs which had been shown to you.

"Will you tell his Honor and the jury whether RCA ran or conducted any tests on these allegedly non-RCA components, indicating Government's Exhibits 3A through 3 'i'?

. . . .

"A There were no tests made on these Exhibits 3A through 'i'." [11]

It is observed that counsel's question referred to the nine transistors in evidence and the witness responded in kind. It now appears that RCA at Kick's instigation, had conducted tests on two transistors of the Mason shipment.

Before considering defendant's charge that Kick's testimony was perjurious, the trial testimony should be rounded out. Munchak testified in his own behalf. He denied that he or anyone else in Astronetics' employ stamped the cas-

9. "Q [Mr. Sullivan, government counsel] : . . . I would like to ask you one more question with respect to the transistors which have been identified as 3A through 3'i', 31A and 2. And I want to ask you if you can tell from looking at those transistors whether or not they were made by RCA.

"MR. WARD [defense counsel] : In your opinion.

"Q I am not speaking of the markings. I am just speaking of the casing.

"A RCA did use this type of construction.

"Q Can you tell with any certainty whether RCA did or did not manufacture that casing?

"A No, sir.

"Q You can't tell with any certainty?

"A No, sir.

"Q Can you tell with any certainty when RCA made the casing, if it made it?

"A It would have been in the period 1961 through early 1964.

"Q And how are you able to tell us that it was not made after 1964?

"A The four leads or the four wires that you see on this particular unit that I am holding are imbedded in glass.

If you examine the bottom of the unit, you would see that each lead goes into a piece of glass that shields it.

. . . .

"A . . . In, I believe August 1964, RCA changed its method of manufacture . . . ." (337A–338A.)

10. "Q I believe, in addition, you testified that the devices . . . Government's exhibits 3A through 'i' could possibly . . . be genuine RCA parts, but that they would have had to have been manufactured prior to 1964; is that correct?

"A Yes, sir." (356A.)

11. 368A–369A.

ings of the transistors shipped to Mason. He acknowledged he had made statements that the transistors had been obtained by lot purchase three years before and that they could have been obtained in lots during the last eight or ten years. He testified he had ordered the peg stamps, but only to stamp, as was Astronetics' practice, the outer lids of white boxes in which the units were shipped, thus contradicting the testimony of government witnesses that the shipments had been in large plastic containers. His testimony was also in contradiction of that of employees who denied they had ever stamped either the transistors or boxes. Munchak claimed that he had thrown away the peg stamps because they could no longer be used,[12] but there was evidence that an individual stamp could make up to 100,000 impressions. Munchak denied the testimony of Kick and another RCA investigator attributing to him the alleged false exculpatory statements. The evidence offered by the government was indeed substantial. Obviously the jury chose to believe the government's witnesses and to reject Munchak's explanations.

We now consider the alleged newly discovered evidence urged in support of a new trial. On June 18, 1970, appellate counsel were retained by Munchak to prosecute his appeal, which was argued on March 8, 1971. The judgment of conviction was affirmed on June 1, 1971.[13] Six days thereafter, appellate counsel, who state RCA "has been a client of the firm," wrote to RCA's general counsel and, referring to Kick's trial testimony, requested information as to whether tests had been made on the transistors. The general counsel readily cooperated, furnished information as to Kick's investigation and made available to appellate counsel RCA's interoffice reports and memoranda, now attached to the moving papers.

It appears that on December 8, 1967, Kick sent five of the fifteen transistors that RCA had received from Mason to Ted Kisor, packaging engineer at the RCA plant in Somerville, New Jersey, for examination to determine whether they were RCA products, and when and where they were manufactured and branded. Kisor's conclusion was that the brand marking on the units was not an RCA brand, and in addition, "the glassing area around the leads does not look like RCA's glassed area . . . . ." He suggested that the transistors be opened and checked for internal construction. On December 19 Kick sent two sample units to J. Masters, manager of the Mountaintop Product Distribution Center, with a request for identification as to the type of transistor and for verification as to whether or not they were actually RCA products. In his memorandum to Masters, Kick noted: "We have examined the brand markings and are satisfied that these markings were not applied by RCA." He added that he had recently received information "that these units could have been made by RCA in 1962 or 63." Masters replied to Kick by memorandum dated January 5, 1968, that the project engineer at Mountaintop "thinks" the two units were RCA products and "could have been manufactured during the 1961–1963 period"; he, too, was of the view that the units had been misbranded with the RCA mark and detailed his reasons therefor. He concluded: "Even though the units are good with the exception of the 50 Meg gain test, Germanium has been known to drift, but I don't think they are good units shipped by an R.C.A. location," and suggested they be sent to the Findlay, Ohio plant for the 50 Meg gain test. Kick then forwarded two of the questionable units to the Findlay, Ohio plant for the suggested test. His memorandum to that plant

12. The postal inspector had testified to Munchak's statement that he had thrown away the stamps a week after purchase because they were "fully used up." (198A, 226A.)

13. United States v. Munchak, 443 F.2d 531 (2d Cir. 1971).

stated: "Enclosed are two type 2N1225 units which contain counterfeit brand markings. . . . Our people at Mountaintop agree with our findings relative to the brand marking but are of the opinion the product was manufactured by RCA during the period 1961–63." On January 23, 1968, before getting a report of the tests at Findlay, Kick, in an interoffice memorandum, summarized the results of the tests and closed the file.

"Our investigation disclosed that the units which you brought to our attention were definitely not branded by RCA and this brand is fraudulent.

"Our Engineering people, however, tell us that it is quite possible that the units themselves were manufactured by RCA during the period 1961–63.[14] We traced these units through four sets of hands and since it is impossible to establish legal continuity from one to the other, no further action is planned."

The next day, January 24, the Findlay plant reported that the two units received by it for the 50 Meg gain test were acceptable to RCA criteria.

Although the matter was then closed, the investigation was unexpectedly reopened in August 1968, after it was discovered that it was Munchak who had ordered the five peg stamps from the Patterson Stamp Company. At that time, Postal Inspector Palmer contacted Kick and both went to the RCA plant in Somerville, New Jersey, and caused the transistors to be checked for performance on an oscilloscope. There is no written report of this test. Kick now states he cannot recall "the identity of the engineers who I gave them to or exactly what was to be tested. I merely have a recollection that they performed marginally or inadequately." [15]

Kick's first appearance was before the grand jury on January 20, 1969, when he testified as follows:

"Q Did you run any tests on components with this stamp on it, which was not an RCA stamp such as you have been shown? By 'you,' I mean RCA.

"A RCA did, I did not. I had asked the factory engineers to make some tests on those units to see whether they measured up to our specifications.

"Q Did they?

"A No, sir." [16]

While the defendant charges that Kick lied in saying the units did not measure up to specifications, there is no factual support for this charge. Rather than taking his answer to refer to the tests ending in January 1968, when the investigation was deemed closed, it could be an accurate reference to the more recent August 1968 oscilloscope test, which found the transistors did not measure up to RCA specifications. In any event, the oscilloscope test is unfavorable to defendant's contention as to the quality of the transistors and failure to specify the particular test cannot be assigned as error. It should be noted that Kick definitely stated that RCA factory engineers had "made some tests on those units" and that his grand jury testimony was in the possession of the defendant at trial.

We turn to the trial, where Kick testified RCA had not made "tests on these exhibits 3A through 'i'", a reply which defendant contends is perjurious and which Kick and the government defend as inadvertent forgetfulness. The determination of this issue—whether Kick's answer was erroneous but inadvertent, or intentional and perjurious—gives direction to the standard to be applied

In sum, all reports indicated (1) that the brand marking was fraudulent, and (2) that the units were manufactured no later than 1963. In the course of testing, Kisor and Masters, as well as Kick, had expressed doubt, for various reasons, that the units were RCA transistors.

15. Kick affidavit at ¶ 6.

16. Grand Jury minutes at 9.

in the motion for a new trial. Kick, in an affidavit submitted by the government in opposition to the defendant's motion, categorically denies any intention to mislead the court or jury or to state anything he did not believe to be true. He points out that his trial testimony related to three subjects: (1) his conversation with Munchak in January 1968; (2) the reasons why the label was counterfeit; and (3) whether and when the transistors were assembled by RCA. He notes his testimony did not concern performance characteristics of the RCA 2N 1225 transistors and swears that he did not discuss this in pretrial preparation.

With respect to his answer to the final question put to him at the end of his cross-examination, he swears it never occurred to him to mention prior performance tests because he understood the question to be referring to conclusive tests—the type which involved full scale electrical tests—whereas he considered the tests he caused to be made as mere checks which were far from conclusive. Factually this is so; an affidavit submitted on this motion by an RCA official familiar with proper and adequate testing of RCA 2N 1225 transistors does establish that the tests of which Kick knew were far from adequate; that testing performed upon only two transistors was "insufficient to be useful" and that the number of tests was "insuffi-

cient to determine that the transistors in question were 2N 1225 types." [17]

In appraising Kick's explanation of his answer,[18] it is significant that he has not sought refuge in a claim that his answer was literally true—a position which readily could have been advanced, since the question put to him by defense counsel specifically asked whether any tests had been conducted on "Government Exhibits 3A through 3'i'" (the nine transistors in evidence),[19] and his answer parroted those words. Such an explanation of his answer, which came at the end of a long cross-examination, could readily be accepted as plausible, although it may be acknowledged that the question also could be construed as intending to elicit whether RCA had performed tests on any transistors, whether or not in evidence. However, Kick has not sought to avail himself of such an excuse, but instead has given his explanation, as noted, of why the tests made two years before were not recalled by him when he testified. Considering that the principal thrust of his and the mass of trial testimony centered about the charge of misbranding the casings, and Munchak's denial they were stamped by him or his employees, Kick's explanation is acceptable. Viewed against the backdrop of the entire trial and the demeanor of witnesses at the trial,[20] I do not find that his challenged answer was willfully and knowingly false or intended

---

17. The range of tests normally performed by RCA on its 2N 1225's included 3 classes: Group A (18 electrical performance tests) ; Group B (13 performance tests) ; and Group C (2 groups of mechanical and environmental tests). Only 6 of the 18 tests in Group A were conducted by RCA in December 1968 and January 1969, and none of the tests in Groups B and C.

18. Kick avers another explanation for his answer was that he probably did not recall performance tests because the question seemed to refer to tests seeking to determine whether RCA manufactured the transistors, a subject as to which he did testify.

19. The record does not indicate that the two transistors tested were part of the nine in evidence.

20. *See* United States v. Johnson, 327 U. S. 106, 112, 66 S.Ct. 464, 90 L.Ed. 562 (1946) ; Brown v. United States, 333 F. 2d 723 (2d Cir. 1964) (per curiam) ; United States v. Garrison, 296 F.2d 461, 465 (7th Cir. 1961), cert. denied, 369 U.S. 804, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962) ; Wolcher v. United States, 233 F.2d 748, 751 (9th Cir.), cert. denied, 352 U.S. 889, 77 S.Ct. 61, 1 L.Ed.2d 56 (1956) ; United States v. On Lee, 201 F.2d 722, 723 (2d Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953) ; United States v. Keogh, 271 F.Supp. 1002, 1006 (S.D.N.Y.1967), aff'd in part, 391 F.2d 138 (2d Cir. 1968).

to conceal that the tests in question had been made; it was not perjurious, but was an inadvertent, unintentional misstatement by a witness.[21]

Thus we reach the question whether the reports of the RCA tests constitute newly discovered evidence sufficient to warrant a new trial. Motions for a new trial bring into play two factors, one that there should be finality of judgments and that sentences imposed should be carried out promptly, and the other that a defendant must not be deprived of a fair trial.[22] The standard of materiality which must be satisfied to obtain a new trial on the basis of newly discovered evidence varies with the circumstances under which the defendant was deprived of knowledge of the existence of such evidence.[23] Here, since there was no perjury, and since there is no charge of prosecutorial misconduct, nor any support for such a charge with respect to these tests,[24] the defendant must show that knowledge and use of them "would probably produce a different verdict."[25]

The hard core of the case, as it developed at trial and was presented to the jury, concerned the misbranding of the transistors with the RCA symbols. Thus, defense counsel, in opening, told the jury:

"Let's look at the questions and the issues for just a moment or two. Essentially the issues in this case are whether the defendant, Mr. Munchak, himself or someone acting at his direction, misbranded certain 2N 1225 components to indicate that they had been manufactured by RCA with some five rubber peg stamps, little stamps, which Mr. Munchak purchased in September 1967."[26]

In his summation on this issue, he told the jury:

"We submit to you that the Government has failed to prove beyond a reasonable doubt that Mr. Munchak either rebranded the 2100 2N 1225's before shipping them to Garrett in September 1967, or knew that they had been rebranded when he shipped them or that he intended to pass them off as new RCA parts."[27]

---

21. *See* United States v. DeSapio, 435 F.2d 272, 285–287 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); United States v. Faustin, 371 F.2d 820 (2d Cir.) (per curiam), cert. denied, 387 U.S. 935, 87 S.Ct. 2062, 18 L.Ed.2d 998 (1967). *See also* United States v. Troche, 213 F.2d 401, 403 (2d Cir. 1954); Larrison v. United States, 24 F.2d 82, 87 (7th Cir. 1928).

22. *See* United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 90 L.Ed.2d 562 (1946); United States v. Fassoulis, 203 F.Supp. 114, 117 (S.D.N.Y.1962).

23. *See* United States v. Miller, 411 F.2d 825, 830–831 (2d Cir. 1969); United States v. Keogh, 391 F.2d 138, 146–148 (2d Cir. 1968); Kyle v. United States, 297 F.2d 507, 512 (2d Cir. 1961).

24. Defendant does point to the fact that, as noted above, a postal inspector was present at the August 1968 oscilloscope test. But that test cannot form the basis for a new trial since it found the transistors performed "marginally or inadequately," and its admission at trial could only have bolstered the government's case.

25. The standard formulation, sometimes referred to as the *Berry* rule after Berry v. State, 10 Ga. 511, 527 (1851), requires (1) the evidence must have been newly discovered since the trial; (2) it must be material to the factual issues at the trial and not merely cumulatve or impeaching the character or credit of a witness; and (3) it must be of such a nature that it would probably produce a different verdict in the event of a retrial. *See* United States v. Mayersohn, 452 F.2d 521 (2d Cir. 1971); United States v. Randaccio, 440 F.2d 1337 (2d Cir. 1971) (per curiam); United States v. Polisi, 416 F.2d 573, 576–577 (2d Cir. 1969); United States v. Costello, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); cf. United States v. DeSapio, 435 F.2d 272, 286 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); United States v. Faustin, 371 F.2d 820 (2d Cir.) (per curiam), cert. denied, 387 U.S. 935, 87 S.Ct. 2062, 18 L.Ed.2d 998 (1967).

26. Stenographer's Minutes, Dec. 18, 1969, at 13–14.

27. Stenographer's Minutes, Dec. 29, 1969, at 10.

And the court, in its instructions to the jury, although to be sure it referred to other matters, stated:

"Thus a prime issue is whether the peg stamps ordered for the 2N 1225 RCAs were used on components for misbranding or were they used to stamp the outer boxes within which they were contained.

"Defense counsel in his summation put this disputed question rhetorically: was it to stamp transistors or to stamp boxes?" [28]

The defendant spun out an elaborate tale to support his categorical denial that he had stamped the transistors and to explain his use of the peg stamps. Defense counsel urged that the defendant innocently had the misbranded transistors in stock prior to the time he ordered the peg stamps; that one of the misbranded transistors was sent as a sample from which the stamps were made; that the peg stamps were actually purchased to stamp individual boxes in which the transistors were shipped; and that an intermediate distributor had performed the painstaking chore of removing the transistors from their individual boxes, bulk packaging them, and then sending them on to the next distributor.[29] The jury disbelieved this incredible story. His elaborate but futile attempts to disguise and deny the fact that he had stamped the transistors underscored the government's charge that Munchak knew the brands were fraudulent and intended to pass off the transistors for what they were not. The tests lend no credence to the defendant's story, and the evidence remains intact

that it was Munchak who misbranded the transistors.

The defendant contends, however, that had he known of the reports of the tests, he could have demonstrated there was no misrepresentation, that the transistors were in fact what the brand represented them to be—RCA 2N 1225's of good quality. But there was ample evidence of misrepresentation at trial which remains even after a consideration of these tests. The indictment charged several misrepresentations—that the transistors were manufactured by RCA, that they were of higher quality than was in fact the case, and that they were newer than in fact they were; and the court charged that the defendant was accused of misrepresenting the quality and newness of the transistors as well as their manufacture, and that any misrepresentation would be a sufficient basis upon which to convict.

Defendant on this motion overstates both the importance of the representation of RCA manufacture at trial [30] and the alleged conclusiveness of the present tests. The government's own case developed that these might have been RCA parts, but had to have been manufactured prior to 1964, and emphasized they were falsely stamped to indicate a 1967 date of manufacture. At the trial Kick several times acknowledged they could have been of RCA manufacture. However, defense counsel charges that the tests reveal and Kick knew that the engineering people were "of the opinion that the product was manufactured by RCA . . . ." Kick's statement, however, was a loose paraphrase which overstated a report to

---

28. 554A.

29. In addition to the fact that each of the distributors involved denied that they removed such packaging, the story itself challenged credulity. It is difficult to believe that an intermediate distributor would take the trouble to remove 2100 transistors from their individual boxes, to no apparent purpose, and then ship them on in bulk packaging.

30. While the defendant points to parts of the charge which emphasized the misrepresentation with respect to RCA manufacture, these must be read in the context of the whole charge which also explained the other misrepresentations and must be placed against the backdrop of the entire trial which focused on the issue of misbranding the transistors.

him,[31] and was countered by other indications in the reports of the tests. For example, the manager of the Product Distribution Center wrote: "I don't think they are good units shipped by an R.C.A. location"; and a packaging engineer commented: "In addition to the branding, the glassing area around the leads does not look like RCA's glassed area." The tests measured whether the transistors performed within the ranges specified for that family of transistors, but, as the affidavit of an RCA expert submitted on this motion shows, both the number of transistors submitted and the number of tests performed were insufficient to be useful. Constant reiteration by the defense that the tests are conclusive does not make them so.

Similarly, on the issue of quality, in addition to the affidavit which demonstrates that the tests were insufficient to determine whether these were really 2N 1225's or another type of transistor in the same family, there is the substantial and persuasive testimony of Mason's production supervisor that the transistors did not measure up to the performance of previous 2N 1225's. The insufficient tests on two transistors do not overcome the force of this testimony based on Mason's actual experience with a substantial number of the transistors.

Finally, the reports of the tests, had they been availed of at trial, would have given added strength to the government's case that the transistors were misbranded to represent they were newer than in fact they were. All who tested them were in accord that if they were RCA products they were of 1961–63 vintage, although they were misbranded to show a 1967 date of manufacture. Proof of this misrepresentation does not admit of challenge. This additional evidence would have underscored Munchak's admission that the transistors he shipped had been purchased three years previously and his denial he had shipped the transistors when confronted with the samples by Kick, and would have added devastating force to the government's case.

In short, the tests would not undermine the substantial evidence that the transistors were not what they were represented to be, that Munchak falsely branded them and then developed an elaborate explanation in an attempt to conceal the facts. Had these reports been availed of either as proposed exhibits or for questioning of Kick or other witnesses, rather than detracting from the government's case, they would have added weight to the already substantial evidence.

I am persuaded upon the totality of the trial evidence that whatever test is applied, *Berry*,[32] or its less burdensome counterpart, *Larrison*,[33] the defendant is not entitled to a new trial. Giving due consideration to the use to which information as to the tests and their results could have been put by skilled counsel,[34] and assessing what difference it might have made in trial preparation,[35] I am not persuaded that the jury "might"[36] have, much less that it "probably" would have, reached a different result.

██ Entirely apart from the foregoing finding, which alone requires denial

---

31. His reference is to a memorandum from Masters which states an engineer "*thinks* it is an R.C.A. product and that they *could* have been manufactured during the 1961–63 period," (emphasis added) but concludes, "I don't think they are good units shipped by an R.C.A. location." Memorandum from Masters to Kick, January 5, 1968.

32. *See* Berry v. State, 10 Ga. 511, 527 (1851).

33. *See* Larrison v. United States, 24 F.2d 82, 87 (7th Cir. 1928).

34. *Cf.* United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969). *See also* United States v. Bonanno, 430 F.2d 1060, 1063–1064 (2d Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970).

35. *Cf.* United States v. Polisi, 416 F.2d 573, 577–578 (2d Cir. 1969).

36. " '[M]ight' means something more than an outside chance although much less than the 'would probably' of the Berry rule." Kyle v. United States, 297 F.2d 507, 512 (2d Cir. 1961).

of the motion, it must be denied upon another ground. It is axiomatic that a motion for a new trial must fail if the evidence, with due diligence, could have been discovered before or at trial.[37] The duty of diligent inquiry is not suspended during the pendency of an appeal,[38] particularly where counsel is alerted to the facts which may be of significance.

■ The record demonstrates a lack of due diligence in attempts to obtain the tests or the reports thereon. Defense counsel, and subsequently appellate counsel, had reason to believe that RCA had conducted tests, yet failed either to subpoena RCA records or make any request of RCA until six days after the judgment of conviction was affirmed —two years and four months after the indictment was returned.

The defendant was indicted on February 3, 1969. His trial counsel was sensitive to the likelihood that tests had been made. He moved for discovery and inspection on March 4, 1969, and among other matters sought "[a]ll reports of scientific tests . . . in connection with this case and the tangible evidence which has been subjected to testing." In his affidavit in support of the motion, he further stated, "[t]hese charges could only have been based on scientific tests . . . including, on information and belief, enlarged photographs both of allegedly 'misbranded' components and of allegedly 'genuine' components." The government agreed to discovery and

inspection to the extent that the United States Attorney or the Post Office Department had the items sought.[39] The government added: "Where the Government does not have evidence sought by the defense it should not be required to collect it for the defendant, but defendant should subpoena such items from those who have them if it deems this necessary." Since the government did not know of, nor have reports of the tests, which are the basis of this motion, here was an unequivocal statement advising the defense to subpoena records if they were deemed important. Yet, no such subpoena was ever served on RCA either before or during the trial; nor, with full access to the evidence in the government's possession, did the defendant seek to have tests performed on any of the questioned transistors. Rather, trial counsel contented himself with a request made of Kick at a September 1969 meeting at the 8th Avenue Post Office. The casualness of this meeting appears from the fact that trial counsel's memory of it was "sparked" only after the Assistant United States Attorney, in opposing this motion, with commendable candor called to appellate counsel's attention that such a meeting had occurred. At that meeting Kick produced certain photographs of transistors at issue. The trial did not start until three months thereafter; yet in the interim no subpoena was served upon RCA, nor any letter addressed to it such as so readily produced the tests after the conviction was affirmed.

37. *See, e. g.*, United States v. Edwards, 366 F.2d 853, 873–874 (2d Cir. 1966), cert. denied, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967); Brown v. United States, 333 F.2d 723 (2d Cir. 1964) (per curiam); United States v. Passero, 290 F.2d 238 (2d Cir.), cert. denied, 368 U.S. 819, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); United States v. Pellegrino, 273 F.2d 570 (2d Cir. 1960) (per curiam); United States v. Costello, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); United States v. Hiss, 107 F.Supp. 128, 135–136 (S.D.N.Y.1952), aff'd on opinion below, 201 F.2d 372 (2d Cir.) (per curiam), cert.

denied, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953).

38. *See, e. g.*, United States v. Rao, 318 F.Supp. 416, 420 (S.D.N.Y.1970); United States v. Hoffa, 247 F.Supp. 692, 701 (E.D.Tenn.1965), aff'd, 382 F.2d 856 (6th Cir. 1967), cert. denied, 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1968).

39. The government had no knowledge of these tests until they came to light in connection with this motion. The defendant does not contend otherwise; and Kick swears that he does not recall telling any government official of the tests conducted in December 1967 and January 1968.

It also appears that for a substantial period during the trial, at least five days, information that some tests had been performed at RCA was known and available for use by a diligent defender.[40] The prosecution delivered to the defense, pursuant to section 3500 of Title 18, United States Code, Kick's grand jury testimony that he "had asked the factory engineers to make some tests on those units to see whether they measured up to our specifications."[41] When Kick gave his negative answer to the last question on cross-examination, defense counsel knew that on its face it was at variance with his grand jury testimony on this subject. Kick's examination was completed at the morning session on December 24, and a long holiday weekend followed before the resumption of trial on the morning of December 29. In the interval no subpoena had been issued for RCA records nor any inquiry made as to them. When the trial resumed on December 29, it was evident that the matter of tests was not lost upon counsel. After the government had rested its direct case, before the defense went forward, defense counsel stated:

> "If the government has in its possession any tests made by the RCA Company of the 2N 1225s I would appreciate that I be furnished with those tests if they indicate that the parts are in fact RCA parts.

"The record is not completely clear as to whether tests were in fact made —physical tests. *There seems to be an indication from Mr. Kick that they were.* If the government has them, I would appreciate having them. If not, I would accept the representation of Mr. Sullivan.

. . . .

"MR. SULLIVAN: Mr. Kick testified, I believe, that there was no way of telling whether or not that was an RCA part. If it was an RCA part, it hasn't been made in three years. And that is the best evidence the government has, also.

"THE COURT: What is your answer to that?

"MR. WARD: I didn't think the record was clear at this point. . . ."[42]

With the record "not completely clear" as to whether tests were in fact made, as counsel put it, with the grand jury minutes in its possession referring to RCA tests,[43] the trial continued for another two days without the slightest attempt to clear the matter by subpoenaing RCA records or recalling Kick for clarification or further information. Thus, it is beyond challenge that during a period of at least five days during the trial the defense knew that some tests were performed and further information was readily producible if deemed of significance. The defense cannot claim ignorance of material matters in its pos-

40. *See* Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959) (Frankfurter, J.) ; cf. United States v. Soblen, 301 F.2d 236, 242 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962) ; United States v. Keogh, 316 F.Supp. 921, 930–931 (S.D.N.Y.1970), aff'd, 440 F.2d 737 (2d Cir.), cert. denied, 404 U.S. 941, 92 S.Ct. 285, 30 L.Ed.2d 254 (1971).

41. At the very latest, the grand jury testimony was delivered to the defense upon the conclusion of Kick's direct testimony. However, it is likely that the defense had this earlier. The Assistant United States Attorney noted that from time to time during the presentation of the government's case he had turned over to the defense the § 3500 material, including Kick's grand jury testimony. (Stenographer's Minutes, Dec. 29, 1969, at 400–01.) However, it is not altogether clear whether this occurred at the start of the trial or how long before Kick took the witness stand.

42. 382A–383A. (emphasis added)

43. The suggestion that the reference to such tests might have been lost amid the mass of material handed over at trial is disposed of by the fact that trial counsel did recognize the indication that some tests had been performed.

session. It was there; it was available; it was simply not availed of.[44] Under the circumstances it cannot be said that the test of due diligence has been met.

As noted, appellate counsel was substituted on June 18, 1970. On October 9, 1970, appellant's brief was filed, and after argument the conviction was affirmed on June 1, 1971. Six days later counsel made a request of RCA, which readily responded and made available the reports which now ground this motion as newly discovered evidence. Appellate counsel, in support of this motion, stated: "After we had completed our briefs, I became convinced beyond a moral certainty that Munchak was not guilty."[45] This view, it is further stated, was deepened by the circumstance that as to counts 1 and 2, which the court had dismissed, there was extensive evidence that the manufacture of the transistors there at issue (JAN CGO 2N 1722) could not be determined by looking only at the brand, but that electronic tests would have to be run and the transistors cut open and the internal works examined.[46] Thus, appellate counsel also was alerted no later, according to their own statement, than October 9, 1970, the date of filing briefs, to the purported significance of tests now claimed to require a new trial. Yet, no step was taken to ascertain the existence of this evidence, so easily available to appellate counsel as subsequent events demonstrated, for a period of eight months, not until the conviction was affirmed. The pending appeal did not dispense with the duty of due diligence. Nor would it have foreclosed consideration of a motion for a new trial on the ground of newly discovered evidence.[47] Under

all the circumstances, again it cannot be said that the requirement of due diligence has been met.

The motion for a new trial is denied.

---

44. *Cf.* United States v. Passero, 290 F.2d 238, 245 (2d Cir.), cert. denied, 368 U.S. 819, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

45. Costikyan affidavit at ¶ 10.

46. Costikyan affidavit at ¶ 11.

47. *See* Brown v. United States, 134 U.S. App.D.C. 1, 411 F.2d 716 (1969) (per curiam); United States v. Comulada, 340

F.2d 449, 452 (2d Cir.), cert. denied, 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965); United States v. Smith, 331 F.2d 145 (6th Cir. 1964) (2 cases); United States v. Minkoff, 181 F.2d 538 (2d Cir. 1950) (per curiam); Rakes v. United States, 163 F.2d 771 (4th Cir. 1947) (per curiam); 2 C. Wright, Federal Practice and Procedure § 557, at 534–35 (1969).