**UNITED STATES of America, Appellee,**

v.

**Raymond MARQUEZ, a/k/a "Spanish Raymond", et al., Appellants.**

**Nos. 968, 969, 970, Dockets 71-1223, 71-1246, 71-1250.**

United States Court of Appeals, Second Circuit.

Argued June 2, 1971.

Decided July 16, 1971.

Rehearing and Rehearing En Banc Denied Nov. 8, 1971.

See also D.C., 319 F.Supp. 1016.

A. Nancy Rosner, New York City (Edmund Allen Rosner, New York City, of counsel), for appellant Marquez.

Joseph I. Stone, New York City (Selig Lenefsky, New York City, of counsel), for appellant Angelet.

Henry B. Rothblatt, New York City (Monte Engler, New York City, of counsel), for appellant Rivera.

Thomas J. Fitzpatrick, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, Allan A. Tuttle, Asst. U. S. Atty., of counsel), for appellee.

Before CLARK, Associate Justice,* SMITH, Circuit Judge, and ZAVATT, District Judge.**

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from the United States District Court for the Southern District of New York (Edward Weinfeld, Judge) from a judgment of conviction entered against Raymond Marquez,

---

* Retired Associate Justice of the Supreme Court, sitting by designation.

** Senior District Judge for the Eastern District of New York sitting by designation.

Anthony Angelet, and Pedro Rivera for violations of 18 U.S.C. § 1952 and 18 U.S.C. § 371,[1] Appellants Marquez and Angelet were sentenced to concurrent terms of three years imprisonment on each count, and Rivera to eighteen months.

The government's basic contention is that Marquez, who controlled a numbers operation in Harlem, forced one of his messengers, Juan Nieves Monserrate (hereinafter "Nieves"), to travel to Puerto Rico to secure funds to be paid to appellants pursuant to an extortion conspiracy. Marquez was alleged to have accomplished this by means of threats against Nieves and his father-in-law Tomas Alvarez.

On December 7, 1969 Rivera, who was also an employee of Marquez in the policy operation, informed Nieves that he had been accused of cheating on the numbers operation and that Marquez wanted to see him about it. The following day Rivera drove Nieves and his father-in-law to the Caribe Florist Shop which served as the "bank" for the policy operation. There Marquez took Nieves into a back room where the appellant Angelet was waiting and accused Nieves of cheating the operation by betting for himself after part of the daily winning number had already been determined.[2] The two men demanded that Nieves pay them $14,000. Nieves informed them that all the money he had (about $7,300) was in Puerto Rico. He was instructed to go there and get it. During this meeting physical threats were made by Angelet against both Nieves and his father-in-law. Sometime after the conversation began Rivera entered the room. There is conflicting testimony as to whether he came in before or after the threats were made by Angelet.

The next day Rivera went to the Alvarez home and collected $1,000. He also collected $700–800 from Nieves. Later that same day Nieves flew to Puerto Rico and retrieved $7,435.00, returning to New York on the following day.

When Nieves stepped off the plane at Kennedy Airport he was met by agents of the F.B.I. who told him that they knew of his problems with Marquez. Nieves agreed to cooperate with the agents and after detailing the entire story was allowed to return home. On the

1. 18 U.S.C. § 1952:

  (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
  (1) distribute the proceeds of any unlawful activity; or
  (2) commit any crime of violence to further any unlawful activity; or
  (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
  (b) As used in this section "unlawful activity" means (1), any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2), extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

18 U.S.C. § 371:

  If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

  If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

2. The winning number was determined by the total amount bet at a particular race track on that particular day.

following day he returned to the F.B.I. headquarters and called Rivera to report that he had the money. Rivera instructed him to bring it to the flower shop where "Raymond" would be waiting. Nieves took the money to the shop and gave it to Marquez. The F.B.I. then entered the shop and arrested Marquez. Rivera and Angelet were later taken into custody.

The appellants raise a number of different allegations of error, none of which have any merit. Marquez contends that the money which Nieves obtained in Puerto Rico did not constitute the "proceeds of an unlawful activity" as required by the statute. This argument was not raised below, and the appellant is thus precluded from arguing it for the first time here. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). In any case, the government contends quite correctly that the question is not whether Nieves in acting as a messenger for the numbers operation had himself obtained the money illegally, but rather that he was ordered to Puerto Rico to obtain the proceeds of what was clearly an illegal operation carried on by the appellants.

Marquez next alleges that the trial court erred by not charging the jury that it must find that the defendants had committed acts in furtherance of the conspiracy following Nieves' return from Puerto Rico. Judge Weinfeld, however, in discussing the third element of the offense specifically charged that the jury must find that "at a time subsequent to such interstate or foreign travel, the defendant performed or attempted to perform one or more acts to promote, carry on, or facilitate the promotion or carrying on of the unlawful activity of extortion." The portion of the charge to which the appellant takes exception related to the intent element of the offense which, of course, required only that the government show that at some time during the conspiracy the defendants had an intent to cause interstate travel for purposes of extortion.

The appellants next argue that the travel to Puerto Rico, since it was not undertaken either by a defendant or a co-conspirator, did not come within the terms of the statute. The appellants principally rely on the Supreme Court's recent decision in Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059–1060, 28 L.Ed.2d 493 (April 5, 1971), where the Court held that section 1952 was not intended to apply in a case where the owners of a Florida gambling operation were convicted on the theory that they had caused the unlawful interstate travel of their patrons. The Court went on to note, however, that "[t]here are cases in which the federal courts have correctly applied § 1952 to those individuals whose agents or employees cross state lines in furtherance of illegal activity, see, e. g., United States v. Chambers, 382 F.2d 910, 913–914 (6 Cir. 1967); United States v. Barrow, 363 F.2d 62, 64–65 (3 Cir. 1966), cert. denied, 385 U.S. 1001 [87 S.Ct. 703, 17 L.Ed.2d 541] (1967); United States v. Zizzo, 338 F.2d 577, 580 (7 Cir. 1964), cert. denied, 381 U.S. 915 [85 S.Ct. 1530, 14 L.Ed.2d 435] (1965)." The Third Circuit has recently specifically held that section 1952 is properly invoked where the only interstate travel is by the victim of an extortion scheme. United States v. DeCavalcante, 440 F.2d 1264 (3 Cir. 1971).

Angelet and Rivera contend that there is insufficient evidence of their participation in the conspiracy. Rivera clearly participated in the events of the conspiracy from beginning to end. He initially informed Nieves that he was accused of cheating. He accompanied Nieves to the meeting with Marquez. He participated in at least part of the conversation in which Nieves and Alvarez were threatened. He instructed Nieves to bring the money to the flower shop after he returned from Puerto Rico. There was, therefore, more than sufficient evidence to link Rivera to the conspiracy.

Angelet's participation is equally well established. He participated in the meeting with Marquez, Nieves and Al-

varez. He used obscene and threatening language with Nieves, and he threatened Alvarez with physical injury. In addition, he appeared at the flower shop when Nieves delivered the money.

 Marquez next alleges that it was error to permit some members of the jury to take notes during the trial and later use them in the course of their deliberations without any special instructions as to their use or without permitting defense counsel to inspect them. It has been well established in this circuit that it is within the trial court's discretion to allow the jury to take notes. The appellant has suggested no reason why this should be reconsidered. United States v. Chiarella, 184 F.2d 903, 907 (2d Cir. 1950).

 Finally Rivera argues that his trial should have been severed from that of his co-defendants in order that he might comment on their refusal or failure to testify. Rivera bases this contention on dictum found in the Fifth Circuit's opinion in DeLuna v. United States, 308 F.2d 140 (1962), where the court noted:

> If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately. 308 F.2d at 141.

Judge Weinfeld filed a typically exhaustive memorandum opinion on this question and based his holding on alternative grounds. He first found that Rivera had put forward no argument which showed that his defense was in any way inconsistent with or antagonistic to that of his co-defendants.[3] He went on to find that in any event *De-Luna's* dicta should not be followed. He noted that it had not found favor with those courts which have considered it and it had been specifically rejected by

at least one court of appeals. United States v. McKinney, 379 F.2d 259, 265 (6 Cir. 1967). He concluded that if no adverse inference could be drawn against a defendant or a witness who exercised his Fifth Amendment privilege, by the same token no "inference of innocence [can be drawn] in favor of a defendant who does testify because of a witness' or a codefendant's refusal to testify."

We are of the view that Rivera has failed to show sufficient inconsistency in his defense to justify a severance and therefore do not find it necessary now to consider the question raised by *De-Luna*.

The judgment of the district court is affirmed.

---

3. *See* United States v. Caci, 401 F.2d 664, 672 (2d Cir. 1968), cert. denied as to defendants Caci and Cino, 394 U.S. 917, 89 S.Ct. 1180, 22 L.Ed.2d 450 rev'd on other grounds as to defendants Natarelli and Randacci, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969).