**UNITED STATES of America**

**v.**

**Raymond MARQUEZ, Defendant.**

**No. 70 Cr. 113.**

United States District Court,
S. D. New York.

Aug. 2, 1973.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, for United States of America; John J. Kenney, Asst. U. S. Atty., of counsel.

Paul A. Goldberger, New York City, for defendant.

EDWARD WEINFELD, District Judge.

This motion for a new trial is predicated upon the alleged perjury of two government witnesses. The movant, Raymond Marquez, along with his two codefendants, was convicted on December 18, 1970, after a six-day trial on all three counts of an indictment charging them with causing Juan Nieves Monserrate to travel between New York City and Puerto Rico for the purpose of: (1) distributing the proceeds of an illegal gambling operation; (2) committing extortion; and (3) conspiring to commit both of these offenses.[1] The Court of Appeals affirmed the convictions[2] and an application for writ of certiorari was denied by the Supreme Court.[3] Marquez now contends that the government's two principal witnesses, Monserrate and Tomas Alvarez, perjured themselves as to testimony which "went to the heart and substance" of the government's case.[4]

In order to place the present motion in proper perspective, it will be useful to briefly outline the relevant testimony at trial. The essence of the government's charge was that Marquez, the "boss" or "banker" of the operation, caused Monserrate, by means of threats against him and his father-in-law Tomas Alvarez, to travel to Puerto Rico for the purpose of returning to Marquez funds of which he was alleged to have cheated the operation. The evidence established that on December 7, 1969, codefendant Rivera, who was a "controller" in the policy operation, told Monserrate, who was a "pickup" man or messenger, that something was wrong in his operation and that "Raymond" (Marquez) wanted to see him at the "bank," the headquarters of Marquez's policy operation. The next day Rivera drove Monserrate and Alvarez to the "bank," a florist shop, where Monserrate was taken into a room of an adjoining premise and was met by petitioner, Marquez, and a codefendant, Angelet. Marquez accused Monserrate of cheating the operation by placing bets for himself after two numbers had been published. Monserrate denied the cheating, which Marquez computed at $14,000; when Monserrate said all the money he had was in Puerto Rico, at one point or another both Marquez and Angelet ordered him to go there immediately to return with the money; when Monserrate sought delay because his wife was in the hospital, Marquez and Angelet responded that was not their problem; that Monserrate knew with whom he was playing and better bring back the money for his own good. Other statements of a similar nature, clearly threats, were made by Marquez and Angelet. Later, when Alvarez was brought into the room, he also was accused of cheating by Marquez, and during this session threats of physical violence were made, and at one point Angelet upraised a long iron bar which he threatened to ram into Alvarez's chest. Marquez told Alvarez if he did not pay, his family would have to pay and that he could not escape. Monserrate testified he was scared and frightened that something might happen to his family. The next morning, December 9, Monserrate withdrew $1000 from a bank and gave either $700 or $800 to Rivera, who testified he delivered the money to Marquez. Monserrate used the balance to purchase a round trip air passage ticket to Puerto Rico, to where he flew that day and retrieved $7,435 from his aunt, who had been holding it for him. He flew back to New York the next day and upon deplaning at Kennedy Airport was met by FBI agents who told him they were aware of his problem with Marquez. He agreed to cooperate, told them what had occurred at the "bank," and turned over the $7,435 to the agents. The following morning, December 11, Monserrate,

---

1. 18 U.S.C. §§ 1952, 371.

2. United States v. Marquez, 449 F.2d 89 (2d Cir. 1971).

3. Marquez v. United States, 405 U.S. 963, 92 S.Ct. 1173, 31 L.Ed.2d 239 (1972).

4. The two codefendants do not join Marquez in this motion.

pursuant to the instructions and under surveillance of FBI agents, returned to the "bank," where he delivered the $7,435 to Marquez, whereupon he was arrested.

The instant motion for a new trial upon the claim of newly discovered evidence is made two years after the return of the jury verdict. The petitioner's newly retained attorneys, engaged after the affirmance of the judgment of conviction, made arrangements with Pedro Lopez, an acquaintance of Monserrate, to engage in conversations with respect to his testimony at the trial. Lopez's conversations with Monserrate and one with Alvarez spanned the period from May to September 1972, and took place in the office of the attorneys, who actively participated in that discussion. On all occasions Lopez had on his person a concealed tape recorder. Statements made by Monserrate and Alvarez during these recordings, allegedly at variance with their trial testimony, are the basis of the present motion, as to which an evidentiary hearing was conducted. The petitioner contends that Monserrate, the principal witness, testified falsely at the trial that (1) Marquez ordered him to go to Puerto Rico to return with the money he said he had there; (2) that upon his arrival at Kennedy Airport he turned over to FBI agents the money he had brought here from Puerto Rico; and (3) that he did not cheat the gambling operation. Marquez also alleges that Alvarez testified falsely at the trial with respect to his role in the cheating.

In addition to the opportunity to observe the witnesses who testified at the evidentiary hearing, the Court has read a translation of the transcriptions of the recordings submitted by petitioner's counsel, since the conversations except the one at the attorneys' office were mostly in Spanish. While the tapes, unclear in many spots, contain statements which could be viewed as at variance with Monserrate's trial testimony as to the three specifications of alleged perjury noted above, it is unnecessary to consider the first two because this Court is convinced beyond a reasonable doubt, based upon the evidence presented at the hearing, the demeanor of the witnesses thereat and the trial record, that Monserrate's trial testimony as to these matters was truthful. We shall presently consider Monserrate's acknowledgment at the hearing, that contrary to his trial testimony, he did cheat the gambling operation, which he insisted was the only matter as to which he gave false testimony at the trial. As to the other two items, Monserrate adhered to the substance of his trial testimony that Marquez ordered him to go to Puerto Rico to get the money and made the threats, direct and implied; also, that upon his return he surrendered the $7,435 to the FBI agents at the airport. Monserrate's trial and hearing version of his surrender of the money to the FBI was fully corroborated by the trial and hearing testimony of FBI agents and by the written receipt for the money given an FBI agent.[5]

Alvarez's trial and hearing testimony also lend support to Monserrate's trial and hearing account of Marquez's order that he go to Puerto Rico to obtain the money. And while it may be argued that Alvarez's testimony is suspect, strong corroboration is found in the circumstances that the morning following the "kangaroo court," presided over by Marquez and Angelet, Monserrate withdrew $1000 from his bank account, using part of the proceeds for his airplane tickets; that he left that very day for Puerto Rico and returned the next day; further, that Alvarez, too, the morning following these events, gave Rivera, who came to his home, his entire savings, $1000, because he was afraid. But en-

5. Petitioner relied upon Monserrate's statement during one of the tape recordings, when led on by Lopez's suggestive question, that upon arrival at Kennedy Airport he was met by some of Marquez's men and turned the money over to them and not to the FBI. If this were the fact, there is no explanation for petitioner's failure to produce at the hearing his men who allegedly received the money.

tirely apart from affirmative evidence supporting Monserrate's trial testimony on the foregoing two items, there are factors which seriously undermine those portions of the taped conversations which petitioner relies upon to support his charges. First, Monserrate's taped recorded statements are by no means a model of clarity; indeed, they are not only unclear, but abound with contradictions of the very statements upon which petitioner relies; there are points at which Monserrate confirms that Marquez did direct him to get the money from Puerto Rico accompanied by threats,[6] and that he did surrender the money to the FBI at Kennedy Airport.[7] Secondly, the questioning by Lopez, and on the one occasion by Marquez's attorneys was continually leading, suggestive and left no doubt as to the answers that were desired, which in a number of instances parroted the questions. Monserrate was clearly under considerable pressure and harassed throughout these conversations. At several points Lopez accused Monserrate of squealing on Marquez and testifying against him for money.[8] It is not surprising that under these circumstances he lied to Marquez's lawyers and Lopez in order, as he put it at the hearing, "to get them off my back" because "all I wanted was to be left alone."[9] Moreover, both Monserrate and Lopez testified at the hearing that the former consumed substantial quantities of liquor during the course of each of the recorded conversations.[10] Monserrate stated that he was drunk when he left the lawyers' offices and one of the lawyers admitted hard liquor was consumed by Monserrate, but denied he was drunk while there; and an earlier recorded conversation with Lopez contains a declaration by Monserrate that he was drunk.[11] Based upon a consideration of all factors, the Court finds that Monserrate's testimony at trial as to (1) Marquez's order, accompanied by threats, to go to Puerto Rico and return with the money, and (2) his meeting at Kennedy Airport with the FBI was truthful and not in any way perjured.

We now turn to the third item, Monserrate's and Alvarez's trial testimony that they did not cheat Marquez's gambling operation. Monserrate admitted at the evidentiary hearing, as the tape recordings reflect, that his trial testimony on this subject was false. His explanation was that he felt he was in jeopardy; that there had been talk of putting bullets through people; and he was afraid of both Marquez and Angelet; further, that at the time of trial a relative, whom he regarded as his mother, was dying; his wife was at the hospital and with the troubles in the case he "wouldn't have cared if I had died."[12] Whatever his explanation, which of course does not excuse perjury, the question remains whether the denial of the cheating at the trial constitutes sufficient grounds to warrant a new trial.

■ Preliminarily, we consider the appropriate standard under which this claim is to be reviewed. The general standard governing motions for a new trial on the ground of newly discovered evidence is that the evidence must have been discovered after trial, must be material to the factual issues at the trial and not merely cumulative or impeaching, and of such a character that it would probably produce a different verdict in the event of retrial.[13] A more

---

6. *See, e. g.*, p. 13 of 8/22/72 tape transcript:

 "And then Raymond Marquez and Angellette and a few more Italian guys they made me go to Puerto Rico and get the money and they tell me if I don't go to Puerto Rico and get that money they are going to kill my family—my three kids and my wife."

7. *See* pp. 17–18 of 8/2/72 tape transcript.

8. *See* pp. 21–24 of 8/17/72 tape transcript.

9. Hearing minutes, 91–92.

10. *Id.* at 15–17, 74–76.

11. *See* p. 13 of 7/28/72 tape transcript.

12. Hearing minutes, 87.

13. *See* United States v. Kahn, 472 F.2d 272, 287 (2d Cir. 1973); United States

liberal standard applies, however, in some instances, where the newly discovered evidence establishes that testimony introduced against a defendant was perjured. "Where the conviction is shown to be based even in part upon perjured testimony . . . a court will not stop to inquire as to the precise effect of the perjury, but will order a new trial if without the perjury the jury might not have convicted." [14] Recently, however, the Court of Appeals has suggested that this more liberal test should be restricted to instances of perjury which involve prosecutorial misconduct.[15] The movant contends that the government knew that Monserrate cheated and permitted him to give perjured testimony, but this allegation is without the slightest evidential support. At the hearing the FBI agents and the Assistant United States Attorney involved in the case testified that Monserrate refused to admit that he had cheated during interrogations prior to the trial. Indeed, at the hearing he acknowledged that he had never told any law enforcement officials that he had cheated prior to a discussion with an FBI agent in late 1972 when interviewed in connection with the present motion.[16] The government agents can hardly be accused of suppressing information which they did not possess. There is no basis for suggesting, as movant does, that the FBI and the United States Attorney had an obligation to pursue the question of whether Monserrate had in fact cheated and should not have accepted his denials at face value. The issue was totally unrelated to the guilt or innocence of the defendants and was, as the FBI agents noted, "insignificant" [17] and "not really relevant" [18] to the investigation they were conducting.

 In the absence of prosecutorial misconduct, the ultimate question to be decided is whether, had Monserrate testified at the trial that he cheated, it would probably have produced a different verdict. At the outset it is noted that the subject of cheating was exaggerated far out of proportion to its significance as to the essential elements of the crimes charged, and while proper on the issue of credibility, was patently an attempt to becloud the issue. Whether or not Monserrate or his father-in-law cheated Marquez's policy operation was not an element of the crimes charged against him or directly related to his guilt or innocence.[19] To put the matter in proper focus, the Court instructed the jury:

> "There has been much evidence and discussion as to whether Nieves cheated—a charge he denies. Even if you should find, as the defendants contend, that Nieves Monserrate cheated through a fix of numbers on the policy operation, this does not justify extortionate means to obtain the return of the money by wrongful threats and the inducement of fear. The alleged wrongful acquisition of the proceeds by Monserrate is not a defense against the crime of extortion. Accordingly, should you find that Nieves Monserrate cheated as claimed, and further find that the defendants intended to obtain the return of all or part of the money by instilling fear that either he or a member of his family would be injured,—and if the

v. De Sapio, 456 F.2d 644, 647 (2d Cir. 1972) ; United States v. Polisi, 416 F.2d 573, 576–577 (2d Cir. 1969).

14. United States v. Polisi, 416 F.2d 573, 577 (2d Cir. 1969). This is the rule articulated in Larrison v. United States, 24 F.2d 82, 87 (7th Cir. 1928).

15. United States v. DeSapio, 435 F.2d 272, 286 n. 14 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

16. Alvarez also testified at the hearing that he never admitted cheating to law enforcement officials.

17. Hearing minutes, 156–57.

18. *Id.* at 164–65.

19. *Cf.* United States v. Munchak, 338 F. Supp. 1283, 1292–1293 (S.D.N.Y.), aff'd, 460 F.2d 1407 (2d Cir.), cert. denied, 409 U.S. 915, 93 S.Ct. 236, 34 L.Ed.2d 177 (1972).

other elements of the offense under counts 2 and 3 are met beyond a reasonable doubt, you have sufficient upon which to convict." [20]

Movant, however, argues that had Monserrate admitted upon the trial that he had cheated the gambling operation, it would have affected the jury's deliberation in two respects. First, that since he had transported the proceeds of his betting activities to Puerto Rico, the jury might have believed that he, Monserrate, either individually or as part of the conspiracy, had violated the law and was testifying favorably for the government in order to avoid prosecution, and that this would have cast doubt upon the substance of his testimony as to what happened at the flower shop. The suggestion that Monserrate was himself the likely subject of prosecution is, to understate it, rather farfetched. The FBI agents had information that Monserrate had gone to Puerto Rico because of his "trouble" with Marquez and told him they were there to protect him. To argue that a prosecution was intended against the alleged victim of the extortion carries its own refutation. Moreover, it was entirely clear from the FBI agents' and Monserrate's trial testimony that he did in fact cooperate with them from his arrival at Kennedy Airport until the arrest of Marquez the following day, and the jury was free to surmise, as defense counsel argued, that he must have had reasons for so doing. Indeed, to the extent that movant claims that he was deprived of the opportunity to argue effectively to the jury that Monserrate was cooperating with the government in order to protect himself from possible charges of wrongdoing, it must be pointed out that the inference was available regardless of whether he had cheated, because the interstate transportation of the proceeds of a gambling operation with intent to distribute is a crime whether they are honestly or dishonestly acquired.[21]

Movant's second theory is that if Monserrate had admitted cheating, the jury would have more readily accepted the defendant's contention that Monserrate voluntarily decided, as a matter of conscience, to travel to Puerto Rico to return the money which he had stolen from the operation. The movant suggests it is easier to believe that a man voluntarily returned what he had stolen from another when he admits his theft than to believe that a man would voluntarily give up his own money to which those demanding it had no justifiable claim. But this theory cuts both ways. If Monserrate had admitted that in fact he cheated the operation, the jury might have more readily believed that Marquez was sufficiently angered to make the threats to which Monserrate and Alvarez testified. In addition, considering "the kangaroo court" conducted by Marquez in association with Angelet, the threats of violence thereat, the testimony of Rivera, the third defendant, that Monserrate did admit the cheating, and the totality of the trial record, the jury may well have viewed Monserrate's denial of cheating with skepticism. And the jury may well have accepted the defendant's contention which was so forcefully presented, that Monserrate had cheated, but nonetheless was satisfied that the government had sustained its burden as to the essential elements of the crimes charged. Most importantly, however, the question of cheating was tangential to the principal issues; it went principally to credibility; it did not touch upon the essential elements of the crime. Furthermore, the thesis that Monserrate, after having cheated the operation of thousands of dollars, would voluntarily, in the absence of any threats, travel to and from Puerto Rico in a fast and hurried trip in order to obtain and return the proceeds of his theft approaches the incredible. Against the background of the trial as it unfolded from day to day, witness to witness, the totality of the trial evidence

---

20. Trial minutes of Dec. 18, 1970, pp. 39–40.

21. See 18 U.S.C. § 1952.

and the record of this proceeding, this Court is satisfied to a moral certainty that had Monserrate and his father-in-law acknowledged upon the trial they had cheated the policy operation, it would not have, whichever test is applied, whether Berry v. State,[22] or Larrison v. United States,[23] changed the outcome of the trial—in sum, that it would not have raised a reasonable doubt in the mind of a single juror.[24]

■■■ There is also an entirely independent ground which requires the denial of this motion. It is well established that a motion for a new trial must be denied if the evidence, with due diligence, could have been discovered during the course of the trial [25] or the pendency of the appeal.[26] The record clearly establishes, however, that Pedro Lopez, the individual who approached Monserrate, was known to petitioner prior to the occurrence of events at the "bank" in December 1969 and available to Marquez's counsel prior to the disposition of the appeal in the summer of 1971. At the hearing Lopez testified that he was contacted by both Marquez's present and trial counsel sometime prior to the summer of 1971 concerning the possibility of his assisting Marquez. Given the availability of Lopez, no explanation has been offered or is readily apparent as to why the evidence upon which the present motion is based was not secured for over a year thereafter. Under these circumstances, it cannot be said that the requirement of due diligence has been met.

The motion for a new trial is denied.

22. 10 Ga. 511, 527 (1851).

23. 24 F.2d 82, 87 (7th Cir. 1928).

24. *Cf.* United States v. Munchak, 338 F. Supp. 1283, 1292–1293 (S.D.N.Y.), aff'd, 460 F.2d 1407 (2d Cir.), cert. denied, 409 U.S. 915, 93 S.Ct. 236, 34 L.Ed.2d 177 (1972).

25. *See, e. g.,* United States v. Edwards, 366 F.2d 853, 873–874 (2d Cir. 1966), cert. denied, Jakob v. United States, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967); Brown v. United States, 333 F.2d 723 (2d Cir. 1964) (per curiam); United States v. Munchak, 338 F.Supp. 1283, 1293–1294 (S.D.N.Y.), aff'd, 460 F.2d 1407 (2d Cir.), cert. denied, 409 U.S. 915, 93 S.Ct. 236, 34 L.Ed.2d 177 (1972).

26. *See* United States v. Rao, 318 F.Supp. 416, 420 (S.D.N.Y.1970); United States v. Hoffa, 247 F.Supp. 692, 701 (E.D. Tenn.1965), aff'd, 382 F.2d 856 (6th Cir. 1967), cert. denied, 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1968).