The UNITED STATES of America,

v.

Raymond MARQUEZ, Defendant.

No. 70 Cr. 113.

United States District Court,
S. D. New York.

Sept. 1, 1981.

John S. Martin, Jr., U. S. Atty., for the Southern District of New York, New York City, for United States; Michael S. Feldberg, Asst. U. S. Atty., New York City, of counsel.

Goldberger, Feldman, Dubin & Young, New York City, for petitioner Raymond Marquez; Michael Young, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

The petitioner, Raymond Marquez, the "banker" of a numbers operation in Har-

lem, was convicted in December 1970 of the crime of forcing by extortionate threats,[1] Juan Nieves Monserrate, one of his "runners" in the operation, to travel from New York to Puerto Rico and to return with funds that had been sent there by Monserrate. Marquez now moves, more than ten years after his conviction and after he has served the three-year sentence imposed upon him, for a writ of error coram nobis to vacate his judgment of conviction. Familiarity is assumed with the opinion of the Court of Appeals affirming his conviction,[2] and this Court's subsequent opinion denying petitioner's motion for a new trial.[3]

The motion for a new trial was based upon the ground that Monserrate and Alvarez, his father-in-law and also a "runner," perjured themselves at the trial by their denials that they had cheated the operation. Petitioner and co-defendant Angelet did not testify at the trial. The third defendant, Pedro Rivera, a "controller" in the gambling operation, testified that Monserrate had admitted cheating and that no threats were made to induce Monserrate to go to Puerto Rico and that he went there voluntarily to obtain and return the money.

At the evidentiary hearing on the motion for a new trial, Monserrate acknowledged that, contrary to his trial testimony, he did cheat the gambling operation. The Court, for reasons set forth in its opinion, denied the motion for a new trial.

The instant application centers essentially upon the same ground upon which petitioner's prior motion for a new trial was based, to wit, the perjury of Monserrate and Alvarez; however, this time petitioner enlarges his claim and charges that not only was their perjury at the trial known to government agents but that the government agents themselves committed perjury at the trial and the hearing on petitioner's motion for a new trial; and, further, that the government failed to disclose prior to and during the trial documents to which he was entitled under *Brady v. Maryland*,[4] or pursuant to 18 U.S.C. § 3500 and Rule 16 of the Federal Rules of Criminal Procedure. Accordingly, he contends that the government violated his right to due process of law and seeks vacatur of his judgment of conviction.

Petitioner initially based his motion upon a telex dated December 12, 1969 ("telex"), prepared by the agent of the FBI in charge of the criminal division,[5] drawn from information contained in the FBI files relating to the investigation of the charges against petitioner. The telex is a lengthy summary of the origin of the investigation and subsequent events. It includes reference to questioning of Monserrate at Kennedy Airport upon his return from Puerto Rico with the money, proposed action by the United States Attorney, plans to apprehend Marquez and alleged co-conspirators upon delivery of the extorted money, the protection of lookouts and the failure by FBI agents to apprehend one Anibal Carrion, to whom Marquez gave the money after it was delivered to him by Monserrate, and who managed to leave the scene of the crime unapprehended by surveillance agents. Despite an intensive search, Carrion was unavailable at the time of petitioner's trial. The telex, among other matters, states:

> After a penetrative interview, Nieves [Monserrate] finally admitted his involvement in the situation [as outlined by Alvarez][6] and reluctantly agreed to cooperate. He stated he had recovered Seven Thousand Four Hundred Thirty Five Dollars of the money *swindled from Marquez*

1. Marquez and two co-defendants were convicted of violations of 18 U.S.C. § 1952 and 18 U.S.C. § 371.

2. 449 F.2d 89 (2d Cir. 1971), *cert. denied*, 405 U.S. 963, 92 S.Ct. 1173, 31 L.Ed.2d 239 (1972).

3. 363 F.Supp. 802 (S.D.N.Y.1973), *aff'd mem.*, 490 F.2d 1383, *cert. denied*, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974).

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

5. This was obtained by petitioner under the Freedom of Information Act, 5 U.S.C. § 552 (1977 & Supp. 1978).

6. This was originally deleted; the inserted matter was furnished after the argument of the motion.

and had brought that amount with him [emphasis supplied].

Stressing this excerpt, petitioner urges it supports his claim for the voiding of the judgment of conviction on the grounds here advanced.

The government in response to petitioner's motion, made available other FBI documents upon which he also relies to support his current charges. One is the FBI report of an interview with Alvarez on December 10, 1969 in which Alvarez admitted that he and Monserrate had "past posted"[7] bets in the Marquez operation. The December 10 report was offered by the government as the only source reference to "the money swindled from Marquez" contained in the December 12, 1969 telex.

The government does not dispute that the two documents, the December 10, 1969 report and the telex, reveal that Alvarez told the agents that Monserrate had cheated the numbers operation by past posting; it does dispute that they indicate that Monserrate himself admitted the cheating prior to or during the trial. It emphasizes that the December 10 report refers only to Alvarez' own statement or admission.

As to the December 12 telex, the government also contends that it does not establish that Monserrate himself made the statement that the money was "swindled from Marquez." Rather, it contends that this was the language reflecting the conclusion of Richard Baker, Special Agent in charge of the Criminal Division of the New York FBI office, who prepared the telex as a summary report of all matters pertaining to the investigation based on reports by FBI agents who in fact were active in the investigation and eventual prosecution of Marquez. It is represented on this motion that Baker has no present recollection of the case but since the telex bears his initials, he either prepared or approved it but does not recall what he meant by the phrase "swindled from Marquez"; that he does not recall if he inserted the phrase based upon

information derived from an informant, Alvarez or Monserrate or was based upon reports prepared by agents working on the case. The government urges that the most plausible explanation is that Baker coined the expression himself either based upon statements of cheating by an informant or Alvarez, rather than that it was based upon anything Monserrate said since there is an absence of any material in the government files prior to 1973 that Monserrate admitted the cheating and further that he consistently, both prior to and during the trial, denied the charge to government agents and the Assistant United States Attorney.

Thomas J. Fitzpatrick, the Assistant United States Attorney who prosecuted the case affirms his testimony given on petitioner's motion for a new trial that at no time prior to, during or after the trial, did either Monserrate or Alvarez disclose to him that Monserrate had cheated petitioner's gambling business; that during pre-trial conferences he specifically questioned them on the subject and on each occasion each steadfastly denied the cheating; and that it was not until the post-trial hearing in 1973 that he first learned of any evidence that would indicate their testimony at the trial on this subject was false. Further, he swears that he never saw or heard of the December 10, 1969 FBI report, an internal FBI document, until sometime in 1981 when it was turned over to the United States Attorney's office in connection with this motion; finally, he swears that no FBI agent ever indicated to him that either Monserrate or Alvarez admitted they had cheated the numbers operation.

A second report submitted by the government on this motion, dated December 18, 1969, is attached as an Exhibit to Mr. Fitzpatrick's affidavit. The December 18 report states, among other matters, that the FBI received information that Monserrate and Alvarez "had been engaged in past-posting activities and had subsequently been threatened by Anthony Angelet in the

---

**7.** "Past posting" is a form of cheating. It involves placing a bet on the numbers after one or more of the winning three digits has already been determined, thereby greatly enhancing the bettor's chance of winning.

presence of Raymond Marquez." Fitzpatrick states that since the report bears a notation that it was directed to his attention, he must have received it, although he has no recollection that in fact he did; that since he was aware from the inception of the case that Marquez had accused Monserrate of past-posting, the report could not have contributed corroborating evidence of the accusation.

Petitioner also relies upon the statement in the December 18 report to support his claim of prosecutorial misconduct. The government, however, contends that the report was turned over to the petitioner at the trial as § 3500 material and thus he had information paralleling that which he now relies upon to support his charges. Petitioner, however, disputes that the report was delivered to the defense in its entirety and contends that the portion quoted above was excised. The trial record is not altogether clear on the matter.[8] However, this report is hereafter referred to in the discussion of the materiality of the reports of December 10 and December 12, which the government concedes were not disclosed to petitioner.

The government, in further support of its position that the prosecution was unaware of the falsity of Monserrate's and Alvarez' testimony, has submitted a translation of an interview with Monserrate on December 15 in which he describes events leading to the direction by Marquez that he go to Puerto Rico and states that when Marquez accused him of cheating, he said it "was not true." The statement is typical of others made by Monserrate prior to and during the trial denying the accusation that he had cheated the Marquez gambling operation.

At a conference called by the Court following argument of this motion, the petitioner was offered an opportunity of a hearing to question the agents, the Assistant United States Attorney or any other witnesses whose testimony may be pertinent to the issues raised by petitioner, but this was declined and petitioner's counsel stated he preferred to rely upon the affidavits and the record as submitted on this motion.

The first issue to be decided is whether, as now charged by petitioner, the Assistant United States Attorney who prosecuted the case and the FBI agents who investigated and worked on the case knowingly permitted the use of false testimony by Monserrate and Alvarez at the trial in their denials of cheating; whether those FBI agents who testified at the trial themselves committed perjury on that issue and whether they again, as well as the Assistant United States Attorney, committed perjury at the hearing of the motion for a new trial when they denied that Monserrate and Alvarez had prior to or during the trial admitted cheating the policy bank. Upon the motion for a new trial, the Court had the benefit of the demeanor of witnesses. At that hearing, Monserrate admitted his trial testimony was false. His explanation was that he was in fear of his life or injury to him and to members of his family because of threats made by Marquez and Angelet, accompanied by an assault with an iron rod by Angelet upon Alvarez, his father-in-law; that "he felt he was in jeopardy; that there had been talk of putting bullets through people; and he was afraid of both Marquez and Angelet; further, that at the time of the trial, a relative, whom he regarded as his mother, was dying; his wife was in the hospital, and with troubles in the case, he 'wouldn't have cared if [he] had died.' "[9] He testified that he had never told any enforcement official that he cheated prior to a discussion he had with a FBI agent in late 1972 when interviewed in connection

---

8. The record indicates that the December 18 report was introduced as Exhibits 3504 and 3507. Transcript at 292–93. Exhibit 3504 contains pages two to four of the report with the first paragraph of page two excised. The government contends that the entire report was introduced as 3507. In offering Exhibit 3507 into evidence, however, Mr. Fitzpatrick described it as "another *portion* of that report dated Dec. 18, 1969." Transcript at 293. It is unclear, therefore, whether Exhibit 3507 contained the material in question.

9. *United States v. Marquez*, 363 F.Supp. 802, 805 (S.D.N.Y.1973).

with the motion for a new trial. The Court, upon a review of the hearing testimony and the then existing record, found that there was no prosecutorial misconduct and accepted the testimony of the FBI agents and the Assistant United States Attorney that Monserrate refused to admit, and had repeatedly denied, that he had cheated during the interrogations prior to the trial. Upon a consideration of all matters presented to the Court on the current motion, the Court has no reason to change its view of the credibility of the government officials, their probity as witnesses, or its conclusion that they were unaware of the false swearing by Monserrate and Alvarez at the trial. The documents relied upon by petitioner require no change of view.

To place matters in proper focus it must be emphasized, as it was at the trial, that the charge against petitioner and his co-defendants centered about extortionate acts and conduct. While inquiry into the alleged cheating was proper in an attack upon the credibility of Monserrate and Alvarez, this Court was of the view that it was an attempt to becloud the basic issue in the case and to divert the jury's attention from it; indeed, the issue was specifically drawn to the jury's attention by the Court in its charge; the jury was instructed that even if it found that Monserrate had cheated the policy operation, it did not justify extortionate means to obtain the return of the money and that Monserrate's alleged cheating was not a defense to the charge.[10] The cheating issue was totally unrelated to the guilt or innocence of the defendants, and was, as the FBI agents who testified at the hearing noted, "insignificant" and "not really relevant to the investigation they were conducting," with respect to the charge of interstate travel by extortionate methods.[11]

**10.**  *Id.* at 806.

**11.**  *Id.*

**12.**  *Cf. United States v. Pacelli,* 491 F.2d 1108, 1119 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974).

In the circumstances, it is understandable that the reports that are the predicate for petitioner's motion were inadvertently overlooked or due to a breakdown in communication between the prosecution and the FBI.[12] Other than petitioner's and his counsel's averments, there is nothing to support the charge that the reports were knowingly and intentionally withheld from petitioner at his trial, or the more serious charge that government agents knowingly used perjured testimony at the trial, that they themselves gave false testimony upon the trial and at the hearing for a new trial. The Court finds upon the entire record that their testimony of what Monserrate and Alvarez told them or failed to tell them with respect to cheating the policy operation was truthful in all respects.

There remains, however, to be considered the significance of the government's failure to deliver to petitioner the FBI report of December 10, 1969 and the December 12, 1969 telex and the standard of materiality to be applied in deciding whether petitioner, by reason of such nondisclosure, was deprived of his constitutional right to due process. The government concedes that the fact that Alvarez stated on December 10 he and Monserrate had cheated the policy operation should have been disclosed to Marquez, as well as the report itself which contains the information.[13]

As to the telex of December 12, the government's position is that since the document is a report of Baker, a senior FBI officer reviewing the actions of agents, disclosure was not required because it was neither a document discoverable under Rule 16 of the Federal Rules of Criminal Procedure nor a statement of a witness within the meaning of 18 U.S.C. § 3500. The government concedes only that it was "re-

**13.**  It appears that this report, an internal FBI document, was not turned over to the United States Attorney's office until 1981. The prosecution concedes that this does not excuse the government's failure to disclose the information to petitioner at or prior to the time of his trial. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

quired by *Brady* to reveal the *fact* that Alvarez had admitted the cheating." The Court goes beyond and holds that in addition the government was required to disclose the telex reference that Monserrate "stated he had recovered Seven Thousand Four Hundred Thirty Five Dollars of the money swindled from Marquez and had brought that amount with him." In any event, the government's position is that the failure to disclose the documents or the information contained therein did not deprive defendant of his right to a fundamentally fair trial. For the purpose of this motion the Court assumes (although as already noted there is a dispute as to whether the previously quoted portion of the December 18 report was delivered to him at the trial) that it was excised and hence not disclosed and that it should have been disclosed.[14]

The fact that documents or information should have been disclosed to defense counsel is not dispositive of petitioner's application. The failure to do so does not automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict...." *United States v. Keogh*, 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required under *Brady, supra*, at 87. A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...."[15]

Moreover, the Supreme Court has cautioned that coram nobis relief should be granted "only under circumstances compelling such action to achieve justice"[16] and "justice does not demand a conviction be overturned if suppressed evidence would not have assisted the defendants when all the facts were developed."[17] The "omission must be evaluated in the context of the entire record."[18]

■ This Court's finding that there was no prosecutorial misconduct rules out a strict test of materiality. Nonetheless, the Court is prepared to apply the most stringent test of materiality—that petitioner's conviction must be set aside if there is any reasonable likelihood that the nondisclosed material could have affected the judgment of the jury.[19] Stating it perhaps somewhat differently, would knowledge of the information contained in those reports have permitted their use by petitioner's experienced trial counsel, through cross-examination, trial strategy, presentation of the defense or summation to the jury, so that in end result there was a significant chance it would have caused a single juror to entertain a reasonable doubt?[20]

■ At the outset it is noted that none of the material is in anywise exculpatory of petitioner; most of it is inculpatory. Additionally, there is no direct statement by Monserrate admitting he had cheated the gambling operation in any of the undisclosed reports. But, it cannot be denied that they could have been used for further cross-examination to impeach witnesses on the claim of cheating. However, this matter, as the Court noted, was "exaggerated far out of proportion to its significance as to the essential elements of the crime

14. Although petitioner purports to rely upon the alleged failure to disclose fully the December 18 report, it is significant that he concedes the alleged omitted material "contains no mention of the [alleged] fact that both Alvarez and Monserrate had confessed to the agents that they had been involved in a past-posting scheme." Young affidavit, dated August 25, 1981.

15. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

16. *United States v. Morgan*, 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954).

17. *United States v. Keogh*, 417 F.2d 885, 887 (2d Cir. 1969); *see also United States v. Keogh*, 391 F.2d 138, 148–49 (2d Cir. 1968).

18. *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976).

19. *Id.* at 103, 106, 96 S.Ct. at 2397, 2398.

20. *Cf. United States v. Sperling*, 506 F.2d 1323, 1333 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975); *United States v. Miller*, 411 F.2d 825, 832 (2d Cir. 1969).

charged, and while proper on the issue of credibility was patently an attempt to becloud the issue" [21] and "was tangential to the principal issues; it went principally to credibility; it did not touch upon the essential elements of the crime." [22] Petitioner presses that possession of the reports not only could have been availed of for impeachment of Monserrate, the principal witness, but would have served another valuable purpose in support of the defense. He argues knowledge of the undisclosed reports would have enabled the defense to persuade the jury that Monserrate, aware that petitioner knew of the cheating, voluntarily and as a matter of conscience went to Puerto Rico of his own free will and returned with the money and that he did not travel there because of threats by petitioner and his co-defendant. This contention is, in the light of the totality of the evidence, utterly unrealistic and sheer rhetoric; as noted previously, it "approaches the incredible." [23]

This Court has a vivid recollection of the trial and in addition, since the filing of this motion has re-read, word-for-word, the transcripts of the trial and the hearing on the motion for a new trial, and reviewed the appellate record. Viewed against the "actualities of a long" and "living trial," [24] which include events preceding the "kangaroo court" when Monserrate was ordered to appear at the session later presided over by petitioner, aided by Angelet, his strong-arm man, the accusation of cheating, the demands for the return of the money, the threats of injury and harm to Monserrate, his family and Alvarez, accompanied by an assault by Angelet upon Alvarez with an iron bar, followed by Monserrate's immediate and hurried overnight plane trip to and from Puerto Rico, enveloped the trial in a miasma of threats, intimidation and the use of force if the money were not returned.

This Court is convinced to a moral certainty and beyond peradventure of doubt that if petitioner's counsel had had possession of the documents and the information which underlie this motion either before or at the trial, their use by defense counsel, whether for cross-examination of witnesses, or in summation, or to fashion any strategy, or to advance any defense, would not have caused a single juror to have a reasonable doubt as to petitioner's guilt or to vote other than guilty as charged. In summary, there was no reasonable likelihood that the undisclosed material could have affected the judgment of the jury. The petition for a writ of error coram nobis is denied.

So ordered.

---

**21.** *United States v. Marquez*, 363 F.Supp. at 807.

**22.** *Id.* at 807.

**23.** *United States v. Marquez*, 363 F.Supp. at 807.

**24.** *Cf. Glasser v. United States*, 315 U.S. 60, 88, 62 S.Ct. 457, 473, 86 L.Ed. 680 (1942) (Frankfurter, J., concurring).